# COTTING *v.* KANSAS CITY STOCK YARDS COM-
# PANY AND THE STATE OF KANSAS.

**APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.**

No. 1. Argued November 14, 15, 1899. Re-argued, January 23, 24, 1901, before a full bench. Decided November 25, 1901.

The Statute of Kansas of March 3, 1897, entitled " An act defining what shall constitute public stock yards, defining the duties of the person or persons operating the same, and regulating all charges thereof, and removing restrictions in the trade of dead animals, and providing penalties for violations of this act," is in violation of the Fourteenth Amendment of the Constitution of the United States, in that it applies only to the Kansas City Stock Yards Company, and not to other companies or corporations engaged in like business in Kansas, and thereby denies to that company the equal protection of the laws.

IN March, 1897, Charles U. Cotting, a citizen of the State of Massachusetts, filed in the Circuit Court of the United States for the District of Kansas a bill of complaint against the Kansas City Stock Yards Company, a corporation of the State of Kansas, and certain officers of that company, and Louis C. Boyle, Attorney General of the State of Kansas. A few days later, Francis Lee Higginson, a citizen of the State of Massachusetts, filed a bill of complaint in the same court and against the same parties.

These suits were subsequently ordered by the court to be consolidated, and were thereafter proceeded in as one.

The plaintiffs respectively alleged that they were stockholders of the Kansas City Stock Yards Company, and that the suits were brought in their own behalf and that of other stockholders having a like interest, who might thereafter join in the prosecution thereof. The main purpose of the suits was to have declared invalid a certain act of the legislature of the State of Kansas, approved March 3, 1897, entitled " An act defining what shall constitute public stock yards, defining the duties cf

the person or persons operating the same, and regulating all charges thereof, and removing restrictions in the trade of dead animals, and providing penalties for violations of this act."

A temporary restraining order was granted, and subsequently a motion for a preliminary injunction was made. Pending that motion the court appointed a special master, with power to take testimony and report the same with his findings, as to all matters and things in issue upon the hearing of the preliminary injunction prayed for. 79 Fed. Rep. 679. On August 24, 1897, the special master filed his report. On October 4, 1897, the motion for a preliminary injunction was heard on affidavits, the master's report, exceptions thereto on behalf of both parties, and arguments of counsel. The motion was refused, and the restraining order, which had remained in force in the meantime, was set aside. 82 Fed. Rep. 839.

A stipulation was thereupon entered into that the defendants should forthwith file their answers to the bills; that replications thereto should be immediately filed, and that the cases, thus put at issue, should be heard on final hearing, upon the pleadings, proofs, master's report and exhibits, without further testimony from either party.

On October 28, 1897, after argument, the court dismissed the bills of complaint. 82 Fed. Rep. 850. In the opinion of Circuit Judge Thayer there was the following order, which was also embodied in the final decree:

"The great importance of the questions involved in these cases will doubtless occasion an appeal to the Supreme Court of the United States, where they will be finally settled and determined. If, on such appeal, the Kansas statute complained of should be adjudged invalid for any reason, and in the meantime the statutory schedule of rates should be enforced, the stock yards company would sustain a great and irreparable loss. Under such circumstances, as was said in substance by the Supreme Court in, *Hovey* v. *McDonald,* 109 U. S. 150, 161, it is the right and duty of the trial court to maintain, if possible, the *status quo* pending an appeal, if the questions at issue are involved in doubt; and equity rule 93 was enacted in recognition of that right. The court is of opinion that the cases at bar are

of such moment and the questions at issue so balanced with doubt, as to justify and require an exercise of the power in question. Therefore, although the bills will be dismissed, yet an order will at the same time be entered restoring and continuing in force the injunction which was heretofore granted for the term of ten days, and if in the meantime an appeal shall be taken, such injunction will be continued in force until the appeal is heard and determined in the Supreme Court of the United States: provided that, in addition to the ordinary appeal bond, the Kansas City Stock Yards Company shall make and file in this court its bond in the penal sum of $200,000, payable to the clerk of this court and his successors in office, for the benefit of whom it may concern, conditioned that in the event of the decree dismissing the bills is affirmed, it will, on demand, pay to the party or parties entitled thereto all overcharges for yarding and feeding live stock at its stock yards in Kansas City, Kansas, and Kansas City, Missouri, which it may have exacted in violation of sections 4 and 5 of the Kansas statute relative to stock yards, approved March 3, 1897, since an injunction was first awarded herein, to wit, on April —, 1897; and that it will in like manner pay such overcharges, if any, as it may continue to exact in violation of said statute during the pendency of the appeal; said obligation to become void if the statute in question shall be pronounced invalid by the Supreme Court." 82 Fed. Rep. 857.

On November 4, 1897, an appeal was duly taken and allowed to this court.

Subsequently, Louis C. Boyle's term of office as Attorney General having expired, his successor, A. A. Godard, was substituted as a party defendant.

The act of the legislature of the State of Kansas is in the following terms:

"Sec. 1. Any stock yards within this State, into which live stock is received for the purpose of exposing or having the same exposed for sale or feeding, and doing business for a compensation, and which for the preceding twelve months shall have had an average daily receipt of not less than one hundred head

of cattle, or three hundred head of hogs, or three hundred head of sheep, are hereby declared to be public stock yards.

"Sec. 2. Any person, company, or corporation owning or operating any public stock yard or stock yards in this State is hereby declared to be a public stock yards operator, whether living or being within this State or not.

"Sec. 3. Every such public stock yards operator or operators shall annually, on the 31st day of December of each year, file with the secretary of State, an itemized statement certified and sworn to, setting forth the number of head of cattle, calves, sheep, hogs, horses and mules received in his or their public stock yards during the year next preceding.

"Sec. 4. It shall be unlawful for the owners, proprietors, or the employés of the owners or proprietors of any such public stock yards within this State, to charge for driving, yarding, watering, and weighing of stock, greater prices than the following: For driving, yarding, watering and weighing of cattle, 15 cents per head; calves, 8 cents per head; hogs, 6 cents per head; sheep, 4 cents per head; and there shall be but one yardage charged.

"Sec. 5. It shall be unlawful for the owner, owners, or proprietors, or their employés, of any such stock yards within this State, to sell and deliver at the rate of less than two thousand pounds for a ton of hay, or any part thereof, the same to be of good quality, or to charge for or to sell the same at more than one hundred per cent above the average market price, or value of such hay upon the markets of the towns or cities wherein such stock yards are located, upon the day preceding such sale and delivery; and it shall also be unlawful for any such owners, or proprietors, or employés, to sell and deliver less than seventy pounds of corn in the ear for a bushel, or less than fifty-six pounds of shelled corn for a bushel or to charge for or to sell the same at more than one hundred per cent above the average market price or value of such ear corn or shelled corn on the markets of the towns or cities wherein said stock yards are located, on the day next preceding such sale and delivery. All feed not above named shall be sold for no greater per cent of profit than hereinbefore provided.

"Sec. 6. It shall be unlawful for the owners or proprietors of any stock yards to prohibit the owner or owners, or the representatives of any owner or owners of any dead stock in such yard or yards from selling such dead stock to any person or persons.

"Sec. 7. That any person or persons violating any of the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined for the first offence not more than one hundred dollars; for the second offence not less than one hundred dollars nor more that two hundred dollars; and for the third offence not less than two hundred dollars nor more than five hundred dollars and by imprisonment in the county jail not exceeding six months for each offence; and for each subsequent offence he or they shall be fined in any sum not less than one thousand dollars and by imprisonment in the county jail not less than six months.

"Sec. 8. It is hereby made the duty of the attorney general to prosecute all violations of the provisions of this act.

"Sec. 9. All acts or parts of acts in conflict with this act are hereby repealed.

"Sec. 10. This act shall take effect and be in force from and after its publication in the official state paper." Laws of Kansas, 1897, chap. 240, p. 448.

*Mr. William D. Guthrie* and *Mr. B. P. Waggener* for appellants. *Mr. Albert H. Horton* was on their brief.

*Mr. A. A. Godard* for appellees. *Mr. B. H. Tracy* was on his brief.

Mr. Justice Brewer, after making the above statement, delivered the following opinion, and announced the conclusion and judgment of the court.

The learned Circuit Judge, in deciding the case, appreciated the importance of the questions involved, and although denying the relief sought by the plaintiffs, exercised his power of continuing the restraining order until such time as these ques-

tions could be determined. Twice has this case been argued before us. We have had the benefit of able arguments and elaborate briefs of distinguished counsel. That the questions are difficult of solution no one reading the following statement will we think doubt.

It has been wisely and aptly said that this is a government of laws and not of men; that there is no arbitrary power located in any individual or body of individuals; but that all in authority are guided and limited by those provisions which the people have, through the organic law, declared shall be the measure and scope of all control exercised over them.

We shall not attempt to determine all the questions presented, and yet it is fitting that we should state them, and some of the reasons urged in support of their decision one way or the other.

The first we notice is the principal matter in respect to which testimony was offered, which has been most largely discussed by counsel on both sides, and that is the validity of the reduction in the charges of the stock yards company made by the act in question. Has the State the power to legislate on this matter, and, if so, can its legislation be upheld?

In *Munn* v. *Illinois*, 94 U. S. 113, it was held that the State had power to fix the maximum charges for the storing of grain in warehouses in Chicago, the court saying (p. 126):

"Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to the use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use he must submit to the control."

While there was a division of opinion in the court, yet the doctrine thus stated received the assent of a majority of its members and has been reaffirmed since, although accompanied by a constant dissent. *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 U. S. 391. See also the following cases in state courts: *People* v. *Budd*, 117 N. Y. 1; *Lake Shore &*

*Michigan Southern Railway* v. *Cincinnati, Sandusky &c. Railway*, 30 Ohio St. 604; *State* v. *Columbus Gas Light & Coke Co.*, 34 Ohio St. 572; *Davis* v. *The State*, 68 Alabama, 58; *Baker* v. *The State*, 54 Wisconsin, 368; *Nash* v. *Page*, 80 Kentucky, 539; *Girard Point Storage Co.* v. *Southwark Co.*, 105 Penn. St. 248; *Sawyer* v. *Davis*, 136 Mass. 239; *Brechbill* v. *Randall*, 102 Indiana, 528; *Delaware, Lackawanna &c. Railroad Co.* v. *Central Stock Yard Co.*, 45 N. J. Eq. 50.

These decisions go beyond but are in line with those in which was recognized the power of the State to regulate charges for services connected with any strictly public employment, as, for instance, in the matter of common carriage, supply of water, gas, etc. *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347; *Railroad Commission Cases*, 116 U. S. 307; *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 557; *Dow* v. *Beidelman*, 125 U. S. 680; *Chicago, Milwaukee &c. Railway* v. *Minnesota*, 134 U. S. 418; *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362; *St. Louis & San Francisco Railway* v. *Gill*, 156 U. S. 649; *Covington &c. Turnpike Co.* v. *Sandford*, 164 U. S. 578; *Smyth* v. *Ames*, 169 U. S. 466; *San Diego Land Co.* v. *National City*, 174 U. S. 739; *Chicago, Milwaukee & St. Paul Railway* v. *Tompkins*, 176 U. S. 167.

Tested by the rule laid down in *Munn* v. *Illinois*, it may be conceded that the State has the power to make reasonable regulation of the charges for services rendered by the stock yards company. Its stock yards are situated in one of the gateways of commerce, and so located that they furnish important facilities to all seeking transportation of cattle. While not a common carrier, nor engaged in any distinctively public employment, it is doing a work in which the public has an interest, and, therefore, must be considered as subject to governmental regulation.

But to what extent may this regulation go? Is there no limit beyond which the State may not interfere with the charges for services either of those who are engaged in performing some public service, or of those who, while not engaged in such service, have yet devoted their property to a use in which the pub-

lic has an interest? And is the extent of governmental regulation the same in both of these classes of cases?

In *Munn* v. *Illinois*, one of the latter class, in which the power of governmental regulation was affirmed, it was said (p. 125):

"From this it is apparent that down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all."

In *Budd* v. *New York* it was not charged or shown that the rates prescribed by the legislature were unreasonable, and the only question was the power of the legislature to interfere at all in the matter. The same is true of *Brass* v. *Stoeser*, in which nothing was presented calling for any consideration of the test of reasonableness, or of a limit to the legislative power.

As to those cases in which governmental regulation of charges was in respect to parties doing some public service the following is a résumé of the decisions. In *Spring Valley Water Works* v. *Schottler* it was said (p. 354):

"What may be done if the municipal authorities do not exercise an honest judgment, or if they fix upon a price which is manifestly unreasonable, need not now be considered, for that proposition is not presented by this record. The objection here is not to any improper prices fixed by the officers, but to their power to fix prices at all."

In *Railroad Commission Cases* (p. 331):

"From what has thus been said it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation or without due process of law."

In *Wabash Railway Co.* v. *Illinois* nothing was said affect-

ing the question of the extent of the power of the legislature. In *Dow* v. *Beidelman* the quotation heretofore made from the *Railroad Commission Cases* was quoted with approval. In *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minnesota*, the same passage was quoted, and it was added (p. 458):

"If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

In *Chicago &c. Railway Co.* v. *Wellman* it was said (p. 344): "The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates."

In *Reagan* v. *Farmers' Loan & Trust Co.* (p. 399):

"The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

And again (p. 412):

"It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money

or property, if it be possible without prejudice to the rights of others.   There may be circumstances which would justify such a tariff; there may have been extravagance and a needless expenditure of money; there may be waste in the management of the road; enormous salaries, unjust discrimination as between individual shippers, resulting in general loss.   The construction may have been at a time when material and labor were at the highest price, so that the actual cost far exceeds the present value; the road may have been unwisely built, in localities where there is no sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built as well as the rights. of those who have built the road."

In *St. Louis & San Francisco Ry. Co.* v. *Gill* is this language (p. 657):

"This court has declared, in several cases, that there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business."

In *Covington &c. Turnpike Co.* v. *Sandford* (pp. 596–7):

"The legislature has the authority, in every case, where its power has not been restrained by contract, to proceed upon the ground that the public may not rightfully be required to submit to unreasonable exactions for the use of a public highway established and maintained under legislative authority.   If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens upon the public.   So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the service rendered by the company are reasonable is an element in the general inquiry whether the rates established by law are unjust and unreasonable.   That inquiry also involves other considerations, such, for instance, as the reasonable cost of maintaining the road in good condition for public use and the amount that may have been really and necessarily invested in the enterprise.   In short, each

case must depend upon its special facts; and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling the public highway are, as an entirety, so unjust as to destroy the value of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered in determining whether the legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law."

In *Smyth* v. *Ames*, after an elaborate discussion of the question of rates and the power of the legislature in respect thereto, it was said (pp. 546, 547):

" We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

In *San Diego Land Co.* v. *National City* (p. 757):

" The contention of the appellant in the present case is that in ascertaining what are just rates the court should take into consideration the cost of its plant; the cost per annum of oper-

ating the plant, including interest paid on money borrowed and reasonably necessary to be used in constructing the same; the annual depreciation of the plant from natural causes resulting from its use; and a fair profit to the company over and above such charges for its services in supplying the water to consumers, either by way of interest on the money it has expended for the public use, or upon some other fair and equitable basis. Undoubtedly, all these matters ought to be taken into consideration, and such weight be given them, when rates are being fixed, as under all the circumstances will be just to the company and to the public. The basis of calculation suggested by the appellant is, however, defective in not requiring the real value of the property and the fair value in themselves of the services rendered to be taken into consideration. What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public. The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed and which went into the plant may be in excess of the real value of the property. So that it cannot be said that the amount of such bonds should in every case control the question of rates, although it may be an element in the inquiry as to what is, all the circumstances considered, just both to the company and to the public."

And also affirming the limits of judicial interference with legislative action (p. 754):

"But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily

have the effect to deny just compensation for private property taken for the public use."

Nothing was said in *Chicago &c. Ry. Co.* v. *Tompkins* throwing any light upon the questions heretofore referred to.

In the light of these quotations, this may be affirmed to be the present scope of the decisions of this court in respect to the power of the legislature in regulating rates: As to those individuals and corporations who have devoted their property to a use in which the public has an interest, although not engaged in a work of a confessedly public character, there has been no further ruling than that the State may prescribe and enforce reasonable charges. What shall be the test of reasonableness in those charges is absolutely undisclosed.

As to parties engaged in performing a public service, while the power to regulate has been sustained, negatively the court has held that the legislature may not prescribe rates which, if enforced, would amount to a confiscation of property. But it has not held affirmatively that the legislature may enforce rates which stop only this side of confiscation and leave the property in the hands and under the care of the owners without any remuneration for its use. It has declared that the present value of the property is the basis by which the test of reasonableness is to be determined, although the actual cost is to be considered, and that the value of the services rendered to each individual is also to be considered. It has also ruled that the determination of the legislature is to be presumed to be just, and must be upheld unless it clearly appears to result in enforcing unreasonable and unjust rates.

In this case, as heretofore indicated, a volume of testimony has been taken, mainly upon the question of the cost and value of the stock yards and the effect upon the income of the company by reason of the proposed reduction. This testimony was taken before a master, with instructions to report the cost of the stock yards, the present value of the property, the receipts and expenditures thereof, the manner of operation, and such other matters as might be pertinent for a determination of the case. Stated in general terms, his findings were that the value of the property used for stock yard purposes, including the value

of certain supplies of feed and materials which were on hand December 31, 1896, is $5,388,003.25 ; that the gross income realized by the stock yards company during the year 1896, which was taken as representing its average gross income, was $1,012,271.22. The total expenditures of the company for all purposes during the same period amounted to $535,297.14—thus indicating a net income for the year of $476,974.08. The court, however, increased the estimate of the net income by adding to the expenditures the sum of $113,584.65, expended in repairs and construction, thus placing the net income at the amount of $590,558.73. If the rates prescribed by the Kansas statute for yarding and feeding stock had been in force during the year 1896 the income of the stock yards company would have been reduced that year $300,651.77, leaving a net income of $289,916.96. This would have yielded a return of 5.3 per cent on the value of property used for stock yard purposes, as fixed by the master. Or, if the capital stock be taken, after deducting therefrom such portion thereof which represents property not used for stock yard purposes, the return would be 4.6 per cent.

Counsel for appellants challenge the correctness of these findings, and seek to show by a review of the testimony that no such per cent of return on the real value of the investment would be received by the company in case the proposed reduction is put into effect. But without stopping to enter into the inquiry suggested by their contention, it is enough for our present purpose to state in general the conclusions of the master and the court.

On the other hand, it is shown by the findings, approved by the court, that the prices charged in these stock yards are no higher, and in some respects lower, than those charged in any other stock yards in the country, and finding 37 is—

"The other stock yards heretofore enumerated are operated generally in the same manner as those at Kansas City, and there is and was for a long time prior to March 12, 1897, active and growing competition among their owners to attract and secure to each the shipment of live stock from competitive territories. Kansas City is the greatest stocker and feeder market in the world, and while Chicago exceeds it as a general market,

yet, because of the expense of transportation from Kansas City there, and the loss in weight by shrinkage during such transportation, the live stock shipped to and sold at Kansas City in 1896 realized for its owners more than $1,500,000 in excess of the amount which would have been realized if forwarded from Kansas City to and sold on the Chicago market."

Now, in the light of these decisions and facts, it is insisted that the same rule as to the limit of judicial interference must apply in cases in which a public service is distinctly intended and rendered and in those in which without any intent of public service the owners have placed their property in such a position that the public has an interest in its use. Obviously there is a difference in the conditions of these cases. In the one the owner has intentionally devoted his property to the discharge of a public service. In the other he has placed his property in such a position that willingly or unwillingly the public has acquired an interest in its use. In the one he deliberately undertakes to do that which is a proper work for the State. In the other, in pursuit of merely private gain, he has placed his property in such a position that the public has become interested in its use. In the one it may be said that he voluntarily accepts all the conditions of public service which attach to like service performed by the State itself. In the other that he submits to only those necessary interferences and regulations which the public interests require. In the one he expresses his willingness to do the work of the State, aware that the State in the discharge of its public duties is not guided solely by a question of profit. It may rightfully determine that the particular service is of such importance to the public that it may be conducted at a pecuniary loss, having in view a larger general interest. At any rate, it does not perform its services with the single idea of profit. Its thought is the general public welfare. If in such a case an individual is willing to undertake the work of the State, may it not be urged that he in a measure subjects himself to the same rules of action, and that if the body which expresses the judgment of the State believes that the particular services should be rendered without profit he is not at liberty to complain? While we have said

again and again that one volunteering to do such services cannot be compelled to expose his property to confiscation, that he cannot be compelled to submit its use to such rates as do not pay the expenses of the work, and therefore create a constantly increasing debt which ultimately works its appropriation, still is there not force in the suggestion that as the State may do the work without profit, if he voluntarily undertakes to act for the State he must submit to a like determination as to the paramount interests of the public?

Again, wherever a purely public use is contemplated the State may and generally does bestow upon the party intending such use some of its governmental powers. It grants the right of eminent domain by which property can be taken, and taken not at the price fixed by the owner, but at the market value. It thus enables him to exercise the powers of the State, and exercising those powers and doing the work of the State is it wholly unfair to rule that he must submit to the same conditions which the State may place upon its own exercise of the same powers and the doing of the same work? It is unnecessary in this case to determine this question. We simply notice the arguments which are claimed to justify a difference in the rule as to property devoted to public uses from that in respect to property used solely for purposes of private gain, and which only by virtue of the conditions of its use becomes such as the public has an interest in.

In reference to this latter class of cases, which is alone the subject of present inquiry, it must be noticed that the individual is not doing the work of the State. He is not using his property in the discharge of a purely public service. He acquires from the State none of its governmental powers. His business in all matters of purchase and sale is subject to the ordinary conditions of the market and the freedom of contract. He can force no one to sell to him, he cannot prescribe the price which he shall pay. He must deal in the market as others deal, buying only when he can buy and at the price at which the owner is willing to sell, and selling only when he can find a purchaser and at the price which the latter is willing to pay. If under such circumstances he is bound by all the conditions

of ordinary mercantile transactions he may justly claim some of the privileges which attach to those engaged in such transactions. And while by the decisions heretofore referred to he cannot claim immunity from all state regulation he may rightfully say that such regulation shall not operate to deprive him of the ordinary privileges of others engaged in mercantile business.

Pursuing this thought, we add that the State's regulation of his charges is not to be measured by the aggregate of his profits, determined by the volume of business, but by the question whether any particular charge to an individual dealing with him is, considering the service rendered, an unreasonable exaction. In other words, if he has a thousand transactions a day and his charges in each are but a reasonable compensation for the benefit received by the party dealing with him, such charges do not become unreasonable because by reason of the multitude the aggregate of his profits is large. The question is not how much he makes out of his volume of business, but whether in each particular transaction the charge is an unreasonable exaction for the services rendered. He has a right to do business. He has a right to charge for each separate service that which is reasonable compensation therefor, and the legislature may not deny him such reasonable compensation, and may not interfere simply because out of the multitude of his transactions the amount of his profits is large. Such was the rule of the common law even in respect to those engaged in a quasi public service independent of legislative action. In any action to recover for an excessive charge, prior to all legislative action, who ever knew of an inquiry as to the amount of the total profits of the party making the charge? Was not the inquiry always limited to the particular charge, and whether that charge was an unreasonable exaction for the services rendered? As said by Mr. Justice Bradley, in *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 699:

"It is also obvious that since a wharf is property and wharfage is a charge or rent for its temporary use, the question whether the owner derives more or less revenue from it, or whether more or less than the cost of building and maintaining it, or what dis-

position he makes of such revenue, can in no way concern those who make use of the wharf and are required to pay the regular charges therefor; provided, always, that the charges are reasonable and not exorbitant."

In *Canada Southern Railway Co.* v. *International Bridge Co.*, 8 App. Cas. 723, 731, Lord Chancellor Selborne thus expressed the decision of the House of Lords:

"It certainly appears to their Lordships that the principle must be, when reasonableness comes in question, not what profit it may be reasonable for a company to make, but what it is reasonable to charge to the person who is charged. That is the only thing he is concerned with. They do not say that the case may not be imagined of the results to a company being so enormously disproportionate to the money laid out upon the undertaking as to make that of itself possibly some evidence that the charge is unreasonable, with reference to the person against whom it is charged. But that is merely imaginary. Here we have got a perfectly reasonable scale of charges in everything which is to be regarded as material to the person against whom the charge is made. One of their Lordships asked counsel at the bar to point out which of these charges were unreasonable. It was not found possible to do so. In point of fact, every one of them seems to be, when examined with reference to the service rendered and the benefit to the person receiving that service, perfectly unexceptionable, according to any standard of reasonableness which can be suggested. That being so, it seems to their Lordships that it would be a very extraordinary thing indeed, unless the legislature had expressly said so, to hold that the persons using the bridge could claim a right to take the whole accounts of the company, to dissect their capital account, and to dissect their income account, to allow this item and disallow that, and, after manipulating the accounts in their own way, to ask a court to say that the persons who have projected such an undertaking as this, who have encountered all the original risks of executing it, who are still subject to the risks which from natural and other causes every such undertaking is subject to, and who may possibly, as in the case alluded to by the learned judge in the court below, the case of

the Tay Bridge, have the whole thing swept away in a moment, are to be regarded as making unreasonable charges, not because it is otherwise than fair for the railway company using the bridge to pay those charges, but because the bridge company gets a dividend which is alleged to amount, at the utmost, to 15 per cent. Their Lordships can hardly characterize that argument as anything less than preposterous."

The authority of the legislature to interfere by a regulation of rates is not an authority to destroy the principles of these decisions, but simply to enforce them. Its prescription of rates is *prima facie* evidence of their reasonableness. In other words, it is a legislative declaration that such charges are reasonable compensation for the services rendered, but it does not follow therefrom that the legislature has power to reduce any reasonable charges because by reason of the volume of business done by the party he is making more profit than others in the same or other business. The question is always not what does he make as the aggregate of his profits, but what is the value of the services which he renders to the one seeking and receiving such services. Of course, it may sometimes be, as suggested in the opinion of Lord Chancellor Selborne, that the amount of the aggregate profits may be a factor in considering the question of the reasonableness of the charges, but it is only one factor, and is not that which finally determines the question of reasonableness. Now, the controversy in the Circuit Court proceeded upon the theory that the aggregate of profits was the pivotal fact. To that the testimony was adduced, upon it the findings of the master were made, and in recognition of that fact the opinion of the court was announced. Obviously, as as we think, in all this the lines of inquiry were too narrowly pursued.

It may be said that the conclusion of the court was directly against the plaintiffs, and therefore was a decision against all their contentions. It was found, however, that the charges made by the defendant were no greater (and in many instances, less) than those of any other stock yards in the country. Nothing is stated to outweigh the significance of that finding. While custom is not controlling, for there may be a custom on

the part of all stock yards companies to make excessive charges, yet in the absence of testimony to the contrary a customary charge should be regarded as reasonable and rightful. In Gunning on Laws of Tolls, the author says (p. 61) : " Long usage and acquiescence in one uniform payment for toll is undoubtedly cogent evidence that it is reasonable." In *Shephard* v. *Payne*, 12 C. B. (N. S.) 414, 433, Willes, J., said :

" A fee need not be of a fixed and ascertained, but may be of a reasonable amount; and, exercising the power conferred upon us by the case, to draw inferences of fact, we may conclude that, if the claim can be sustained in point of law, it was in fact for a reasonable fee. If so, then, looking to the amount established for similar services by other officers, and remembering what fees have been paid and received within the memory of us all in the Courts of Westminster Hall and at the Assizes, we think there can be little doubt that the fees in question, so far as amount is concerned, are in fact reasonable."

In *Louisville, Evansville &c. Railroad Co.* v. *Wilson*, 119 Indiana, 352, 358, is this language :

" The law makes it the duty of every common carrier to receive and carry all goods, . . . and authorizes a reasonable reward to be charged for the service. The amount to be paid is, in a measure, subject to the agreement of the parties; but when the amount is not fixed by contract, the law implies that the carrier shall have a reasonable reward, which is to be ascertained by the amount commonly, or customarily paid for other like services. *Johnson* v. *Pensacola &c. Railroad Co.*, 16 Florida, 623; Angell, Carriers, section 392; Lawson, Contracts of Carriers, section 125."

Again, the findings show that the gross receipts for the year 1896 were $1,012,271.22; that the total number of stock received during the same time was 5,471,246. In other words, the charge per capita was 18 cents and 5 mills. So that one shipping to the stock yards one hundred head of stock was charged $18.50 for the privileges of the yard, the attendance of the employés and the feed furnished. While from these figures alone we might not say that the charges were reasonable or unreasonable, we cannot but be impressed with the fact that the

smallness of the charge suggests no extortion. Further, as heretofore noticed, the findings show that the establishment of these yards has operated to secure to the shippers during a single year $1,500,000 more than they would have realized in case of their non-existence and a consequent shipment to Chicago, the other great stock market of the country.

It is not to be wondered that the trial court, in deciding the case, observed:

"Conceding, as we must, that the legislation complained of was radical in its nature and effect, that it reduced the company's income about fifty per cent, and that it prevents it from realizing on the capital invested in its plant such a per cent as is ordinarily realized on capital invested in other mercantile and business enterprises, still," etc.

But inasmuch as the inquiry in that court proceeded upon lines which we have indicated were too narrow, it might well be that if there were no other questions we ought to simply send back the case for further investigation upon the true lines of inquiry. There are, however, other questions which compel notice, and one is that suggested by the seventh section in the statute, which provides a punishment for the first offence of not more than $100, for the second offence not less than $100 nor more than $200, for the third offence not less than $200 nor more than $500 and imprisonment in the county jail not exceeding six months, and for each subsequent offence a fine of not less than $1000 and imprisonment not less than six months. The language of this section, taken in connection with the balance of the statute, is not entirely clear. The previous prescriptions of the statute are of a certain charge per head. Now, does this section contemplate a separate offence with a separate penalty for each excessive charge per head, or does it contemplate a single penalty for a violation of the statute in respect to the entire number of stock received in one shipment? The difference is significant. Taking the total number shipped to these stock yards in the year 1896, it amounted to an average of about 15,000 head per day. Would that in case of an excessive charge for each head mean 15,000 violations of the statute? If so, as after the third offence the fine could not be less

than $1000 for each offence, a single day's penalties would aggregate at least $15,000,000. While the fact is not clearly disclosed by the testimony, doubtless the shipments were made by separate shippers in bunches all the way from 50 to 500 in number. If the penalty attaches simply to the charge for each shipment as a single act, the burden, though large, might not be deemed excessive, but if it attaches to that for each particular head of stock the penalties become enormous. It may be said that this is a penal statute, and therefore it is to be construed in favor of the delinquent, and that we have a right to expect that the state courts will construe the penalty as not attaching to the charge for each head of stock, but only to that upon the separate bunches shipped by different individuals. But is the language so clear that there is no doubt as to the construction? Is there not enough in it to justify a construction which may be accepted by the trial courts and approved by the Supreme Court of the State, and the construction of a state statute by the Supreme Court of the State is in a case like this conclusive upon us. Must the party upon whom such a liability is threatened take the chances of the construction of a doubtful statute? If the one construction is placed upon it, then obviously, even accepting the largest estimate of value placed by any witness upon the property of the company, a single day's violation of the statute would exhaust such entire value in satisfaction of the penalties incurred. In this feature of the case we are brought face to face with a question which legislation of other States is presenting. Do the laws secure to an individual an equal protection when he is allowed to come into court and make his claim or defence subject to the condition that upon a failure to make good that claim or defence the penalty for such failure either appropriates all his property, or subjects him to extravagant and unreasonable loss? Let us make some illustrations to suggest the scope of this thought.

Suppose a law were passed that if any laboring man should bring or defend an action and fail in his claim or defence, either in whole or in part, he should in the one instance forfeit to the defendant half of the amount of his claim, and in the other be punished by a fine equal to half of the recovery against him,

and that such law by its terms applied only to laboring men, would there be the slightest hesitation in holding that the laborer was denied the equal protection of the laws? The mere fact that the courts are open to hear his claim or defence is not sufficient if upon him and upon him alone there is visited a substantial penalty for a failure to make good his entire claim or defence. Take another illustration: Suppose a statute that every corporation failing to establish its entire claim, or make good its entire defence, should as a penalty therefor forfeit its corporate franchise, and that no penalty of any kind except the matter of costs was attached to like failures of other litigants, could it be said that the corporations received the equal protection of the laws? Take still another illustration: Suppose a law which, while opening the doors of the courts to all litigants, provided that a failure of any plaintiff or defendant to make good his entire claim or entire defence should subject him to a forfeiture of all his property or to some other great penalty; then, even if, as all litigants were treated alike, it could be said that there was equal protection of the laws, would not such burden upon all be adjudged a denial of due process of law? Of course, these are extreme illustrations, and they serve only to illustrate the proposition that a statute (although in terms opening the doors of the courts to a particular litigant) which places upon him as a penalty for a failure to make good his claim or defence a burden so great as to practically intimidate him from asserting that which he believes to be his rights is, when no such penalty is inflicted upon others, tantamount to a denial of the equal protection of the laws. It may be said that these illustrations are not pertinent because they are of civil actions, whereas this statute makes certain conduct by the stock yards company a criminal offence, and simply imposes punishment for such offence; that it is within the competency of the legislature to prescribe the penalties for all offences, either those existing at common law or those created by statute; and further, that although the penalties herein imposed may be large, yet obedience to a statute like this can only be secured by large penalties; for otherwise the company, being wealthy and powerful, might defiantly disregard its mandates,

trusting to the manifold chances of litigation to prevent any serious loss from disobedience. A penalty of a dollar on a large corporation, whose assets amount to millions, would not be very deterrent from disobedience. It is doubtless true that the State may impose penalties such as will tend to compel obedience to its mandates by all, individuals or corporations, and if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the legislature, in an effort to prevent any inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts, that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws.

But it is not necessary to rest our decision upon this consideration, which was not fully discussed by counsel, but pass to a question which is of a kindred nature and in which there is presented no matter of the doubtful construction of a statute.

The act in terms applies only to those stock yards within the State " which for the preceding twelve months shall have had an average daily receipt of not less than one hundred head of cattle, or three hundred head of hogs, or three hundred head of sheep."

It appears affirmatively from the testimony that there are other stock yards in the State, one at Wichita and one at Jamestown, and it is stated by counsel for appellants that there are many others scattered through the State, each doing a small business. Neither the yard at Wichita nor that at Jamestown, so far as the testimony shows, comes within the scope of this act. So it may be assumed from the record that the legislature of Kansas, having regard simply to the stock yards at Kansas City and the volume of business done at those yards, passed this act to reduce their charges. Undoubtedly, the act is general in its terms, and we may not, therefore, stop to inquire whether it conflicts with the constitutional prohibition contained in article 2, sec. 17, of the constitution of Kansas:

" Sec. 17. All laws of a general nature shall have a uniform

operation throughout the State; and in all cases where a general law can be made applicable no special law shall be enacted."

It may be assumed, for the purposes of the question now to be considered, that so far as the constitution of Kansas is concerned its legislature may enact a law, general in its terms, and yet so phrased as necessarily to have operation only upon a single individual or corporation, but, while making that concession, we cannot shut our eyes to the fact that this act is precisely the same in its effect as though the legislature had said in terms that the Kansas City stock yards alone shall be subjected to its provisions. Accepting, however, the full force of the general language in which the statute is couched, it appears that a classification is attempted between stock yards doing a large and those doing a small business. The express and only basis of classification is in the amount of business done by the two classes. As evidence that we are right in our construction, we may refer to the brief of the learned Attorney General, in which he says:

"The legislature has, by this act, classified the stock yards of the State into two classes, and has adopted the most natural and reasonable basis for such purposes that could be used, namely, the volume of business done. The reason for this is obvious; the stock yards doing a large volume of business are necessarily more of monopolies than those doing a smaller business. The public has greater interest in the business of large stock yards than it has in the business of smaller ones.

\* \* \* \* \* \* \* \*

"Another reason why the classification should be based upon the volume of business done is, that rates which are reasonable and proper and furnish a sufficient return upon the capital invested can very properly be made lower and different in a plant where the volume of business is large, while in a smaller plant doing a smaller volume of business higher rates may be necessary in order to afford adequate returns."

If the average daily receipts of a stock yard are more than one hundred head of cattle, or more than three hundred head of hogs, or more than three hundred head of sheep, it comes

within the purview of this statute.   If less than that amount it is free from legislative restriction.   No matter what yards it may touch to-day or in the near or far future, the express declaration of the statute is that stock yards doing a business in excess of a certain amount of stock shall be subjected to this regulation, and that all others doing less business shall be free from its provisions.   Clearly the classification is based solely on the amount of business done and without any reference to the character or value of the services rendered.   Kindred legislation would be found in a statute like this : requiring a railroad company hauling ten tons or over of freight a day to charge only a certain sum per ton, leaving to other railroad companies hauling a less amount of freight the right to make any reasonable charge ; or, one requiring a railroad company hauling a hundred or more passengers a day to charge only a specified amount per mile for each, leaving those hauling ninety-nine or less to make any charge which would be reasonable for the service ; or (if we may indulge in the supposition that the legislature has a right to interfere with the freedom of private contracts), one which would forbid a dealer in shoes and selling more than ten pairs a day from charging more than a certain price per pair, leaving the others selling a less number to charge that which they deemed reasonable ; or, forbidding farmers selling more than ten bushels of wheat to charge above a specified sum per bushel, leaving to those selling a less amount the privilege of charging and collecting whatever they and the buyers may see fit to agree upon.   In short, we come back to the thought that the classification is one not based upon the character or value of the services rendered but simply on the amount of the business which the party does, and upon the theory that although he makes a charge which everybody else in the same business makes, and which is perfectly reasonable so far as the value of the services rendered to the individuals seeking them is concerned, yet if by the aggregation of business he is enabled to make large profits his charges may be cut down.

The question thus presented is of profoundest significance. Is it true in this country that one who by his attention to busi-

ness, by his efforts to satisfy customers, by his sagacity in discerning the probable courses of trade, and by contributing of his means to bring trade into those lines, succeeds in building up a large and profitable business, becomes thereby a legitimate object of the legislative scalping knife? Having created the facilities which the many enjoy, can the many turn around and say, you are making too much out of those facilities, and you must divide with us your profits? We cannot shut our eyes to well-known facts. Kansas is an agricultural State. Its extensive and fertile prairies produce each year enormous crops of corn and other grains. While portions of these crops are shipped to mills to be manufactured into meal and flour, it is found by many that there is a profit in feeding them to stock, so that the amount of stock which is raised and fattened in Kansas is large, and makes one of the great industries of the State. Now, shall they whose interests are all along the line of production, having by virtue of their numerical majority the control of legislation, be permitted to say to one who acts as an intermediary between transportation and sale, that while we permit no interference with the prices which we put upon our products, nevertheless we cut down your charges for intermediate services; and this not because any particular charge is unreasonable, but because you are making by the aggregate of those charges too large a sum, and ought therefore to divide with us. The possibility of such legislation suggests the warning words of Judge Catron, afterwards Mr. Justice Catron of this court, when in *Vanzant* v. *Waddel,* 2 Yerger, 260, 270, he said:

"Every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community, who made the law, by another."

The Fourteenth Amendment forbids any State to "deny to any person within its jurisdiction the equal protection of the laws." The scope of this prohibition has been frequently considered by this court.

In *Barbier* v. *Connolly,* 113 U. S. 27, 31, it was said:

"The Fourteenth Amendment, in declaring that no State 'shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offences."

And in *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232, 237:

"The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature, or the people of the State in framing their constitution. But clear and hostile

discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition. It would, however, be impracticable and unwise to attempt to lay down any general rule or definition on the subject that would include all cases."

In *Gulf, Colorado & Santa Fé Railway Co.* v. *Ellis*, 165 U. S. 150, 159, in which was presented solely the question of classification, we said, referring to many cases, both State and national:

" But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this. No language is more worthy of frequent and thoughtful consideration than these words of Mr. Justice Matthews, speaking for this court, in *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369 : ' When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' The first official action of this nation declared the foundation of government in these words : ' We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.' While such declarations of principles may not have the force of organic law, or be made the basis of judicial decision as to the limits of right and duty, and while in all cases reference must be had to the organic law of the nation for such limits, yet the latter is but the body and the letter of which the former is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government."

These authorities are referred to again with approval in *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283.

But we may, perhaps, come closer to the particular statute when we consider the decisions of the Supreme Court of Kansas, the State by whose legislature this act was passed. In *The State* v. *Haun*, 61 Kansas, 146, there was presented for consideration a statute providing for the payment of the wages of laborers in money, coupled with this provision in sec. 4:

" Sec. 4. This act shall apply only to corporations or trusts, or their agents, lessees or business managers, that employ ten or more persons."

The act was held unconstitutional. After referring to an alleged defect in the title, the court said (p. 152):

" We have no hesitation in saying that if this statute had, without defect as to. title, clearly and in express terms amended corporate charters, retaining the section classifying corporations to which it was applicable by the number of men in their employ, it would be obnoxious to the Fourteenth Amendment to the Constitution of the United States."

Again on pp. 153, 154:

" The obvious intent of the act is to protect the laborer and not to benefit the corporation. Why should not the nine employés who work for one corporation be equally protected with the eleven engaged in the same line of employment for another corporation ? If such law is beneficial to wage earners in the one instance, why not in the other ? The nine men lawfully paid for their labor in goods at a truck store might with much reason complain that the protection of the law was unequal as to them, when they saw eleven men paid in money for the same service performed for another corporation engaged in a like business. Such inequality destroys the law. In the instance cited, two of the eleven men might quit the employment of the company for which they worked, and by this act alone make a method of payment by the corporation lawful which was unlawful while the eleven were employed. The criminality or innocence of an act done ought not to depend on the happening of such a circumstance. Equal protection of the laws means equal exemption with others of the same class from all charges and burdens of every kind. . . . A classification of the kind attempted makes a distinction between corporations identically

alike in organization, capital and all other powers and privileges conferred by law. It is arbitrary and wanting in reason. The act in question is class legislation of the most pronounced character."

And in support of these views the court quoted from Cooley's Constitutional Limitations, 5th ed. 484, 486.

" Every one has a right to demand that he be governed by general rules and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments. . Those who make the laws ' are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plow.' This is a maxim in constitutional law, and by it we may test the authority and binding force of legislative enactments."

So we have the clear declaration of the Supreme Court of Kansas that legislation by which one individual or even one set of individuals is selected from others doing the same business in the same way and subjected to regulations not cast upon them, is a discrimination forbidden by the constitutional provision which obtains both in the constitution of Kansas and in that of the United States to the effect that the equal protection of the laws is guaranteed to all.

May we not rightfully accept this declaration of law by the highest tribunal of the State by whose legislature the act in question was passed, and, accepting the reasoning of that decision, does it not follow that, if an act which provides certain regulations for corporations employing ten or more laborers and leaving corporations employing less than that number free from such regulations is an unjust discrimination and a denial of the equal protection of the laws, an act which imposes regulations upon corporations doing business over a certain amount and leaving all corporations doing a like business less than that amount free from such regulations is equally obnoxious to constitutional prohibition ?

The significance of the question thus clearly stated and forcibly answered by the Supreme Court of Kansas cannot be over-estimated. It is not the province of this or any other court to consider its purely economic features. It may or it may not be wise, looking at it from such standpoint, to say to every citizen that his industry, ability, activity and foresight may be rewarded up to a certain extent and that beyond that he may not go. But whether it is wise or unwise, is not for the courts to determine. Their limits of inquiry are purely judicial. And the single matter for our present consideration is whether in the restraint which the legislature of Kansas has attempted to impose upon this stock yards company it has trespassed upon those rights which by the Constitution of the United States are secured to every individual against state action. It has been more than once said judicially that one of the principles upon which this government was founded is that of equality of right. It is emphasized in that clause of the Fourteenth Amendment which prohibits any State to deny to any individual the equal protection of the laws. That constitutional provision does not, it is true, invalidate legislation on the mere ground of inequality in actual result. Tax laws, for instance, in their nature are and must be general in scope, and it may often happen that in their practical application they touch one person unequally from another. But that inequality is something which it is impossible to foresee and guard against, and therefore such resultant inequality in the operation of a law does not defeat its validity. As was said in this court in *Merchants' Bank* v. *Pennsylvania*, 167 U. S. 461, 463:

"If it be said that a lack of uniformity renders the statute obnoxious to that part of the Fourteenth Amendment to the Federal Constitution which forbids a State to 'deny to any person within its jurisdiction the equal protection of the laws,' it becomes important to see in what consists the lack of uniformity. It is not in the terms or conditions expressed in the statute, but only in the possible results of its operation. Upon all bank shares, whether state or national, rests the ordinary state tax of four mills. To every bank, State and national, and all alike, is given the privilege of discharging all tax obli-

gations by collecting from its stockholders and paying eight mills on the dollar upon the par value of the stock. If a bank has a large surplus, and its stock is in consequence worth five or six times its par value, naturally it elects to collect and pay the eight mills, and thus in fact it pays at a less rate on the actual value of its property than the bank without a surplus, and whose stock is only worth par. So it is possible, under the operation of this law, that one bank may pay at a less rate upon the actual value of its banking property than another; but the banks which do not make this election, whether state or national, pay no more than the regular tax. The result of the election under the circumstances is simply that those electing pay less. But this lack of uniformity in the result furnishes no ground of complaint under the Federal Constitution. Suppose, for any fair reason affecting only its internal affairs, the State should see fit to wholly exempt certain named corporations from all taxation. Of course, the indirect result would be that all other property might have to pay a little larger rate per cent in order to raise the revenue necessary for the carrying on of the state government, but this would not invalidate the tax on other property or give any right to challenge the law as obnoxious to the provisions of the Federal Constitution."

So again exercising the undoubted right of classification it may often happen that some classes are subjected to regulations, and some individuals are burdened with obligations which do not rest upon other classes or other individuals not similarly situated. License taxes are imposed on certain classes of business, while others are exempt. It would practically defeat legislation if it was laid down as a rule that a statute was necessarily adjudged invalid if it did not bring all within its scope or subject all to the same burdens. It would strip the legislature of its inherent power to determine generally what is for the general interests, which interests may often be promoted by certain regulations affecting one class which do not affect another — certain burdens imposed on one which do not rest upon another.

But while recognizing to the full extent the impossibility of an imposition of duties and obligations mathematically equal

upon all, and also recognizing the right of classification of industries and occupations, we must nevertheless always remember that the equal protection of the laws is guaranteed, and that such equal protection is denied when upon one of two parties engaged in the same kind of business and under the same conditions burdens are cast which are not cast upon the other. There can be no pretence that a stock yard which receives 99 head of cattle per day a year is not doing precisely the same business as one receiving 101 head of cattle per day each year. It is the same business in all its essential elements, and the only difference is that one does more business than the other. But the receipt of an extra two head of cattle per day does not change the character of the business. If once the door is opened to the affirmance of the proposition that a State may regulate one who does much business, while not regulating another who does the same but less business, then all significance in the guarantee of the equal protection of the laws is lost, and the door is opened to that inequality of legislation which Mr. Justice Catron referred to in the quotation above made. This statute is not simply legislation which in its indirect results affects different individuals or corporations differently, nor with those in which a classification is based upon inherent differences in the character of the business, but is a positive and direct discrimination between persons engaged in the same class of business and based simply upon the quantity of business which each may do. If such legislation does not deny the equal protection of the laws, we are unable to perceive what legislation would. We think therefore that the principle of the decision of the Supreme Court of Kansas in *State* v. *Haun,* *supra,* is not only sound, but is controlling in this case, and that the statute must be held unconstitutional, as in conflict with the equal protection clause of the Fourteenth Amendment.

There yet remains a question of jurisdiction. The two suits which were consolidated were each brought by a stockholder in behalf of himself and all other stockholders against the corporation, its officers, and also the Attorney General of the State of Kansas. The object of the suits was to restrain the Attorney General from putting in force the statute, and the

defendants from reducing the funds of the corporation, and therefore the dividends to the stockholders, by yielding compliance to the mandates of the statute, and failing to charge reasonable rates.

Of the jurisdiction of the court over the consolidated suit as one involving a controversy between the stockholders and the corporation and its officers, no serious question is made. *Dodge* v. *Woolsey,* 18 How. 331; *Hawes* v. *Oakland,* 104 U. S. 450; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429; *Smyth* v. *Ames,* 169 U. S. 466, seem conclusive on the question. There is no force in the suggestion that the officers of the corporation agreed with the stockholders as to the unconstitutionality of the statute, and that therefore the suit is a collusive one. That was the condition in *Dodge* v. *Woolsey, supra,* and it only emphasizes the fact that the officers were refusing to protect the interests of the stockholders, not wantonly, it is true, but from prudential reasons.

But the serious contention is that the court had no jurisdiction over the suit as against the Attorney General of the State, and this on two grounds: First, because it is in effect a suit against the State, and therefore forbidden by the Eleventh Amendment to the Federal Constitution; and, secondly, because it is an attempt on the part of a court of equity to restrain criminal proceedings. It is contended on the other hand that it is not a suit against the State because it does not in any way involve its pecuniary interest, and is only an effort to prevent an officer of the State from putting in force an unconstitutional statute; that it does not attempt to interfere with criminal proceedings, because none have been commenced and none are pending, but involves simply a challenge of the constitutionality of the statute. It is also urged that the Attorney General, when served with process, did not raise either defence; did not suggest that this was in effect a suit against the State, or that it was an attempt to interfere with criminal proceedings; that he pleaded several defences and went into a trial of the merits on a motion for permanent injunction; took part in the taking of an immense amount of testimony and in an argument before the trial judge upon the question of the validity of the

statute, and when its validity had been adjudged, then for the first time and as a preliminary to a final decree, to be entered without further testimony, filed an answer containing a formal plea that the suit was one in effect against the State. It is further contended that by the statutes of Kansas, (Comp. Laws, Kans. 1879, p. 901, sec. 5589,) the Governor may require the Attorney General to appear for the State in any court and prosecute or defend therein any cause or matter, civil or criminal, in which the State may be a party or interested, and that while no request from the Governor was shown the trial court was justified, in the absence of some challenge of its jurisdiction, in assuming that such request had been given, and that it would be grossly inequitable, after a full inquiry upon the merits in such court and an adjudication in favor of the validity of the statute, to permit the Attorney General by a formal plea of jurisdiction to prevent any review of the merits in this court. Without expressing any opinion as to the jurisdiction of the court if it had been properly and seasonably challenged, we think the true solution of this matter will be found in reversing the decree upon the merits, and directing a dismissal of the suit as to the Attorney General, without prejudice to any other suit or action. It is, therefore,

*Ordered, that the decree of the Circuit Court be reversed, and the case remanded to that court, with instructions to enter a decree in favor of the plaintiffs and against the corporation and its officers, in accordance with the prayer of the bills, and also a decree dismissing the suit as to the Attorney General of Kansas, without prejudice to any further suit or action.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE GRAY, MR. JUSTICE BROWN, MR. JUSTICE SHIRAS, MR. JUSTICE WHITE and MR. JUSTICE McKENNA.

We assent to the judgment of reversal—so far as the merits of this case are concerned—upon the ground that the statute of Kansas in question is in violation of the Fourteenth Amendment of the Constitution of the United States, in that it applies only to the Kansas City Stock Yards Company and not to

other companies or corporations engaged in like business in Kansas, and thereby denies to that company the equal protec-. tion of the laws. Upon the question whether the statute is unconstitutional upon the further ground that, by its necessary operation, it will deprive that company of its property without due process of law, we deem it unnecessary to express an opinion.