**CULLUM v. STEVENS.**
Civil Action No. 311.

District Court, N. D. Texas, Fort Worth Division.

March 27, 1942.

E. H. Ratcliff, of Fort Worth, Tex., for plaintiff.

Arthur Haddaway, of Fort Worth, Tex., for defendant.

JAMES CLIFTON WILSON, District Judge.

This is another Wage and Hour case, under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. They are becoming so numerous, with questions still undecided by the Supreme Court, it is getting burdensome to write opinions in each case with a view of making them understandable to strangers to them.

The question is here squarely raised, whether the Act applies where the employee was actually producing goods for commerce, as defined by the Act, while

he and his employer were wholly unaware of that fact. Such is admittedly true. They did not know the devices being manufactured, or serviced, as to which it was I must later decide, were passing into interstate commerce after leaving defendant's machine shop.

My construction of the Act is, the lack of such knowledge did not relieve defendant of civil liability where, as here, a substantial portion of the devices were being steadily and directly sold into other States by the local party for whom they were made. Cases like Bagby v. Cleveland Wrecking Co., D.C., 28 F.Supp. 271, and cases there cited do not apply. That such was the intent of Congress is clearly indicated by the absence in the Act of any qualifying words such as knowingly, willfully, etc., in the civil liability provisions of the Act, and their presence, on the other hand, in all of its criminal liability provisions. For one example, this defendant could not be legally convicted for any offense defined in Sec. 215(a) (1) because it in substance provides that it is unlawful for a person to transport, deliver, ship or sell goods, produced in violation of the Wage and Hour provisions, "with knowledge", that such goods were intended for commerce. That express limitation, "with knowledge" in one provision, aside from other qualifying words elsewhere, is significant.

Sec. 216(a) and (b) respectively provide the criminal and civil liabilities. Of that Section, paragraph (a) provides, "any person who willfully violates any of the provisions of section 215 shall upon conviction thereof be subject to a fine", imprisonment, etc. The word, "willfully" applies to every criminal offense defined in the Act. It requires such knowledge of the employer as makes a given act one of determined intentional wrong doing. The next paragraph, (b) of section 216, which immediately follows, prescribes the civil liability for violations. It merely says, "any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." It limits recovery to a violation of the Wage and Hour provisions. The absence of any and all such qualifying words is full of meaning. It would be idle to argue that Congress did not designedly include them in one and exclude them from the other. The discrimination made was essential. It was a precaution the law should take to safeguard the citizens against easy or wrongful conviction for crime, which ordinarily it does not exercise to a like degree in fixing civil liability. In other words, the law was carefully so worded, whether an employer violated it and became liable to any employee for minimum wages or overtime, or both, does not depend upon, or require, proof that the violation was willfully or knowingly or intentionally done. It simply provides for liability, if it is done.

Further, the burden of proof is on plaintiffs in these cases and, as a practical matter, Congress could readily visualize that to require proof by the employee that his employer knew or believed that he was producing goods for interstate commerce would often be a burden impossible of discharge. This is so, because it would involve insurmountable difficulties in proving knowledge as a fact by affirmative proof, but also still greater difficulty in offering circumstantial proof, that would impute sufficient legal knowledge to the employer to enable him to determine for himself whether his production of goods was for commerce, as defined. This defense of a lack of knowledge in the employer that his goods were going into interstate commerce is really equivalent to a defense that a lack of purpose on his part to violate the Act will excuse. In essence, the latter is the defense here interposed. Of course, that is untenable. For the employer to decide or believe that his goods were not going in commerce would mean, as defined, and not infrequently that takes more than a knowledge of all the pertinent facts, but a very accurate personal knowledge of the law, accompanied by the ability to correctly construe it. To appreciate his difficulties in the latter regard we only have to look to the diversity of opinion besetting the lawyers, and flowing from the courts, as to what business comes, or does not come, under the Act. Congress knew to impose any such burdens upon employees would seriously handicap, if not emasculate, any consistent enforcement of the Act to attain the declared policy in its enactment. Again I say, the lack of knowledge of defendant that the devices he made were going into interstate commerce, and therefore, his honest belief

that his business did not come under the Act can constitute no defense; that however unintentionally or unwittingly he may have violated the Act, if he nevertheless did violate it, cannot save him from the civil liability, which the law guarantees to the employee.

Lastly, subsec. (b) of section 215, because of the analogy of the subject there dealt with to the one here, may be appropriately looked to. That paragraph pre-supposes that the employee will not know that the goods he worked upon, in a given place, passed into interstate commerce. To supply for any such possible deficiency of knowledge, the paragraph in substance provides that the mere proof that the employee worked in a place, where goods were shipped or sold into interstate commerce, within 90 days prior to the removal of same from the place of his employment, makes out a prima facie case that such employee was engaged in the production of such goods. Of course, it is a presumption of law that can be overcome by evidence, but as a circumstance bearing upon the question here presented, it also strikes me as being rather significant.

The second defense arises under Sec. 213(a) (2), which exempts from the Act "Any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." The defendant says his machine shop was such an establishment. I do not think so. It is described in the evidence as a general machine shop. I do not mean to say there was no work done by him that might properly be classed as servicing. Assume it was, there was no showing as to how much was intrastate. The entire machine shop was under one roof, with no separate bookkeeping, or department in which servicing work, as distinguished from manufacturing, was carried on.

It is strenuously urged by defendant that the particular work to which plaintiff devoted much of his time was servicing work; that all of the work done for American Metal Products Company, a trade name for Martin E. Marsalis, came in that category. His and defendant's business alike were located in Fort Worth, Texas. Marsalis, among other things, manufactured and sold air conditioning machines for cooling offices, residences etc., in the warm season of the year. It was just another mechanism for blowing moist air into the space or spaces to be cooled. Among its more vital parts was a combination fan and centrifugal water pump, which, when complete, was merely called a pump. The housing for this pump was made by Marsalis himself, the defendant Stevens being engaged only to make the pumps. Marsalis furnished the metal fan material and a tiny electric motor, a little larger than an ordinary spool of thread. The motor was not originally manufactured for this specific purpose, but for any and all purposes for which such a tiny motor could be used. Nothing was to be done to it, except to seat it on a platform, in a position to be connected up for power. The fan material, being a brassy looking sheet metal, had to be cut and shaped and worked into fans by defendant. Also he had to make of metal, a base platform and a structural support connecting it with the motor platform. This supporting frame work consisted of four corner posts made of small metal tubing, being in length approximately 6 or 8 inches. Also there was a monel tube shaft of the same length, which passed down through the center of these four supporting corner posts connecting the top motor platform with the base. The base and shaft were also of metal and had to be cut and put into appropriate forms by defendant. When finished it was a very complete, presentable, piece of mechanism which they called a pump, and did service as such in a very efficient way. All of the materials mentioned, except that furnished by Marsalis as stated in the outset, the motor and fan material, were supplied by defendant. All he furnished, however, cost only about 22 cents, together with the solder, and other like working materials, such as screws, etc. He also, after cutting the necessary metals to appropriate shape, bored holes and threaded them for screws, furnished taps for all connections that bound and held the little structure together. The cost of the two items furnished by Marsalis is not disclosed, because a trade secret. Defendant's complete charge was around $1.30.

Plaintiff for months was principally engaged in the work of making these pumps and was very efficient. In doing the work, his hands, suitable tools, dies and machinery were used. With this picture of work and materials furnished before us, if it was servicing, what did the plaintiff service?

Plainly it was not servicing, but certainly producing, and I say manufacturing, under any and all definitions, goods for commerce. It was a tiny electric motor and sheet metal fan material when it came to defendant, and was a centrifugal water pump complete and ready for operation after being connected up in an air conditioning box, when it left.

Webster's Dictionary is helpful authority on this point. It defines manufacture, as follows: "(1) To make, wares or other products by hand, by machinery or by other agency; as to manufacture cloth, nails, glass, etc; to produce by labor, esp., now, according to an organized plan and with division of labor, and usually with machinery. (2) To work as raw or partly wrought materials, into suitable forms for use", etc.

■ Plaintiff worked for defendant from May 14, 1940, to April 11, 1941, with the exception of about a month from November 23 to December 24, 1940. During all of that time he was not paid the prescribed minimum wage, and, of course, for no overtime according to the law. For such underpayment he sues for $482.13, and an equal amount as liquidated damages, and attorney's fees of $350. Assuming defendant is liable for the whole time, the correctness of the underpayment is not questioned.

To my view, defendant is not liable for the whole time, but only for such time as plaintiff worked upon the pumps. That time, as I recall the evidence, amounts to about four months. Among other things done by plaintiff, he occasionally worked in cleaning up the shop premises and oiling the machinery. For this his attorneys try to bring him for this entire time under the principle of the night watchmen cases. I think that is a little "far-fetched". If applicable to hours devoted to cleaning, the time shown to have been devoted to such incidental tasks is unsatisfactory, and would furnish no accurate basis for any judgment to cover same. There was also evidence that defendant occasionally reconditioned parts of machinery of a milling company in Fort Worth used for producing grain feed, some of which might have been, and probably was, sold out of the State; that the defendant occasionally made trailer fifth wheel pins which, from time to time, were sold interstate; that defendant also did work for the Fort Worth Steel Company on its equipment, which was probably used in manufacturing articles that went out of the State. But the evidence as to the work on the feed mill machinery, the fifth wheel trailer pins and for the Steel Company was indefinite as to when, how much work was done by all employees, or how much of such work, if any, was done by plaintiff, and when, etc. Also, the record is still more indefinite as to which work, other than on the pumps heretofore discussed, was in the production of goods for commerce, as defined. There is such uncertainty as to all such work items that they may be, and are, eliminated in reaching the judgment to be entered.

■ A distinction must be made between establishments like defendant's general machine shop, where a great majority of work items are likely intrastate and one or two or three, done for a total of 76 different customers in 1940 and 1941, are interstate, and work, such as on an oil well where just one product is produced, a substantial proportion of it going interstate. Or a wholesale house, where one department is producing goods for interstate commerce and another department is producing goods for intrastate commerce. In the case of the oil well, all who work in the production of oil, if a substantial part of it goes interstate, except those exempted, are embraced by the Act. In case of such a wholesale house all are not. But only those employees who work in the production of goods for commerce, as defined, or whose work is necessary for such production. Those who work alongside of them, but in the production of intrastate commerce, are not included. In case of a machine shop like defendant's if the plaintiff worked four months in making these pumps, and certain weeks or certain months out of the remaining eight months, he did other work in the production of goods for commerce, or necessary to such production, as is contended for by plaintiff, the burden is on him to show what weeks or months or other time he spent in such work. This is true as a practical matter to enable the Court to figure the judgment he is entitled to, if any. It is not even contended that this has been done here. We are not considering claims of any who may have contributed to plaintiff's work in producing pumps, if they did.

Therefore the judgment here could only be for the time plaintiff worked on the pumps. That, I cannot determine accurately. Possibly the attorneys can agree

as to the amount. If not, I will be compelled to have sufficient of the testimony transcribed to determine that for myself. Whatever it figures, plaintiff shall have judgment for it, and a like amount in liquidated damages.

What I shall say now has little part in the decision, but I do not want any one to get the idea that I am gleefully rendering any judgment for the plaintiff, since whatever I must render will be unjust. I am doing it because, as I view the law, I cannot help myself. The plaintiff was a learner, or apprentice about 17 years of age when given this work by defendant to help him to learn the machinist trade. He had no experience when he started to work. Occupational training by defendant was part consideration of course. He was paid though, from the beginning 10 cents per hour, raised to 12½ in a little over two months, then to 17½, and the last eleven days at 15 cents. Any one knows that he could not have gotten employment, except on some similar basis, and that the schooling he was getting in a life work was valuable. Recognition of the justice of such contracts accounts for Sec. 214 of the Act, which provides that the Administrator may authorize such wage arrangements, and then wages at less than the minimum become perfectly legal. If defendant had had any idea that his shop came under the law, this could have all been arranged with the Administrator, on some legal basis as to wages, hours, etc. The same section, for like humane reasons, covers applicants for work who are physically or mentally deficient, a very wise and just feature of the law. For like motives, as account for those phases of the law, defendant, through his ignorance of the law being applicable to him, assumed the responsibility of employing this minor as a learner. His father as next friend brings this suit for the minor son.

There is one thing about which we can all agree, that is, that no honest man will repudiate any contract he has entered into, fairly made, free of duress or fraud, merely because he later discovers some law under which he can do so at a financial gain. Regardless of law, that can only be done at the price of honesty. This case is an entrapment of a vicious sort. The suit is predicated on the basis that the 17 year old boy, without experience, was a skilled workman. Is it any wonder that this defendant, himself an honest laborer, with a little machine shop, just trying to get ahead, a layman to the legal profession, would be filled with disrespect and distrust for the legislative and judicial authorities of his country that would, with such apparent complacency, evolve a system of laws by which he could be victimized in any such fashion? Were this case an exception, as under all fixed laws an occasional wrong must be done, it might not be worthy of note, but as far as my own experience goes, injustice is rather the rule up to date under this particular law. I make these comments with the reservation that this law is sound at heart. All of us are exasperated at times over things done by labor. Likewise, we are at things done by our friends at times, but we do not necessarily desert them. Were I in a position to do so, despite all the hue and cry for it, I would not repeal either the Wage or Hour provisions of this law. I would change its wording to stop, or greatly lessen, the stream of injustices that constantly flow from its enforcement. But the trial courts are helpless to stop them. Only Congress can be looked to.

A judgment may be drawn as above indicated.