**ANUCHICK et al. v. TRANSAMERICAN FREIGHT LINES, Inc.**

**WILSON et al. v. SAME.**
Nos. 2830, 2834.

District Court, E. D. Michigan, S. D.
Aug. 13, 1942.

862

Alfred Lindbloom and Fred W. Lindbloom, both of Detroit, Mich., for plaintiffs.

Thomas F. Chawke, of Detroit, Mich., for defendant.

PICARD, District Judge.

The questions involved in the above matters relate to whether certain employees of defendant are subject to jurisdiction of the Interstate Commerce Commission or provisions of the Fair Labor Standards Act.

In the first suit No. 2830, the following are employed in these capacities:

| | |
|---|---|
| Walter J. Anuchick... | Tarpaulin Worker |
| Liston Tatom........ | Porter |
| Archie Patterson..... | Pick-up Driver |
| Julius Sebastian...... | Welder |
| Jay Holser.......... | Stockroom Boy |
| Henry Schmidt...... | Night Watchman |
| William Galka....... | Body Worker and Welder |

with the remaining plaintiffs working in the "body shop" and claiming to be carpenters.

In the second suit plaintiffs are employed in the garage as mechanics but claiming that their main work is to manufacture or assemble new equipment.

The Fair Labor Standards Act, Section 13(b) (1), 29 U.S.C.A. § 213(b) (1), states: "The provisions of Section 7 [section 207] shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49"—to-wit the Motor Carrier Act, 1935.

Defendant is a common carrier operating in 12 states with 21 terminals having approximately 760 pieces of equipment consisting of 300 tractors, 310 semi-trailers, pick-up trucks and four-wheel trailers. The principal garage is in Detroit where defendant maintains a crew of about 30 men.

The Motor Carrier Act, Section 204(a) (1) of Part II, 49 U.S.C.A. § 304(a) (1) reads as follows: "It shall be the duty of the Interstate Commerce Commission— (1) To regulate common carriers by motor vehicle as provided in this part [chapter], and to that end the Commission may establish reasonable requirements with respect

to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

The Fair Labor Standards Act was approved June 25th, 1938, and realizing that it must determine the employees for whom it had "power" to establish "qualifications and maximum hours of service" the Interstate Commerce Commission on May 9th, 1939, concluded that such "power" was limited to drivers of vehicles. Included in its report, however, was a provision that interested parties believing that activities of other employees affected the "safety of operation of motor vehicles engaged in interstate and foreign commerce" might ask for a hearing for determination of the question.

December 4th, 1939, the United States Court for the District of Columbia on petition of the American Trucking Associations, Inc., of which defendant is a member, and others, issued a mandatory injunction compelling the Interstate Commerce Commission to assume jurisdiction over *all* employees of common and contract carriers. American Trucking Ass'ns, Inc., v. United States, D.C., 31 F.Supp. 35. (Italics ours.)

Appeal was taken to the Supreme Court of the United States which rendered its decision May 27th, 1940—United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 1069, 84 L.Ed. 1345, reversing the District Court of Columbia and stating that jurisdiction of the Interstate Commerce Commission was limited to "those employees whose activities affect the safety of operation. The Commission has no jurisdiction to regulate the qualifications or hours of service of any others".

Following this decision American Trucking Associations, Inc., asked the Interstate Commerce Commission to determine which employees, if any, other than drivers, were subject to Interstate Commerce Commission jurisdiction. Hearings were concluded January 30th, 1941, and decision made by the Commission March 4th, 1941. It is well to note that in its final conclusion the Interstate Commerce Commission (sheet 13 defendant's Exhibit 3) limits its interpretation of jurisdiction over those employees who perform work affecting "safety of operation *directly*" (Italics

ours). The word "directly" does not appear in the Supreme Court's decision and in the Interstate Commerce Commission holding examples are given of those employees whom it believes do not perform work affecting the "safety of operation directly". Carpenters, tarpaulin tailors are among those mentioned and page 13 of defendant's Exhibit 3 states:

"If there be employees who do nothing but oil, gas, grease or wash the motor vehicles, we find that they do not perform duties which directly affect the safety of operation and are not subject to our jurisdiction. To make our finding in this regard entirely clear, it is that mechanics are the only garage workers we find subject to our jurisdiction."

Beginning with Civil Action No. 2830 it is apparent that

Walter J. Anuchick.... tarpaulin worker
Liston Tatom.......... porter
Jay Holser............ stockroom boy
Henry Schmidt........ night watchman

are employed in work that does not directly affect the "safety of operation" and therefore do not come under the Interstate Commerce Commission. The other parties plaintiff in No. 2830, with the exception of Archie Patterson, whom I will mention later, work on bodies in the "body shop".

Examining the nature of their work we find that they manufacture or build bodies for trucks and semi-trailers—some of them absolutely new. They recondition semi-trailers and where the floor of the old trailer is saved they build a new body. They also build bodies for new pick-up trailers, recondition pick-up trucks and four wheel trailers. They make tail gates and repair old equipment in case of wrecks. Very often a wreck is of such a nature that to put it back in use practically includes a new job. Their work also includes making signs, repairing docks and other miscellaneous carpentry work. Lumber and metal are the materials plaintiffs use, which latter calls for welding.

If you view the testimony from plaintiffs' angle 70 to 80 percent of their time is engaged in "new work" because plaintiffs consider a repair job that requires the building of a new, or practically new, body, as new work.

Viewed from the angle of defendant, however, the only "new jobs" come when there is no repair work to do and if any

part of the old body is saved defendant considers it repair work regardless of how extensive the job may become.

It is the claim of defendant that the work of plaintiffs in case No. 2830 "affect the safety of operation" and gives as an example that a damaged floor in a trailer might cause a serious accident; that workers in sheet metal are not carpenters and that when the Interstate Commerce Commission excepted carpenters they meant maintenance men about the building.

■ From the evidence which is before us we cannot agree with this position of defendant. First, a carpenter is not limited to one who uses lumber alone, and second, the Interstate Commerce Commission did not limit their exception to carpenters. The importance attached to the kind of work—not the name. But we wouldn't call these plaintiffs "carpenters"—we'd class them as "body builders". We believe that all plaintiffs in No. 2830 whether engaged in manufacturing or building new bodies or only repairing used or damaged trucks, trailers or semi-trailers are primarily not engaged in the safety of operation of trucks as trucks; their main job is the safety of the merchandise as merchandise. Theirs is the difference that exists between a trailer and a stake body; or to bring it home to the ordinary autoist —the difference between a coupe and a sedan. They make it possible for defendant to properly carry the load. As for example building in refrigeration units. Certainly whether a truck can carry butter, beef and eggs without spoiling doesn't "affect the safety of operation". Technically there isn't any employee of a transportation company that isn't indirectly doing work affecting the safety of operation but we believe the Interstate Commerce Commission had a definite thought in mind in rendering its decision. That is one reason it used the word "directly". Nor do we see the great need for determining that plaintiffs are engaged "in manufacturing", but if that should become important we hold that they are manufacturing—within the meaning of the word. City of Louisville v. Louisville Tin & Stove Co., 170 Ky. 557, 186 S.W. 124; 38 C.J. 977; United States v. Armature Exchange, Inc., 9 Cir., 116 F.2d 969.

■ In our interpretation of the theory and reasoning of the Interstate Commerce Commission as set forth in its decision of March, 1941—and in fact if there is to be a division in category of defendant's employees—it is evident that all plaintiffs here (2830) are concerned with the safety and size of cargo and that any activity affecting "safety of operation" is incidental. We therefore hold that these plaintiffs are not subject to the rules and regulations of the Interstate Commerce Commission affecting their qualifications and maximum hours of service. Such we believe to be the interpretation of their own powers by the men who know.

■■ We then come to Civil Action No. 2834. These men are admittedly mechanics but plaintiffs claim they are engaged in manufacturing or assembling new equipment and give six examples or items of their labors to prove that they are manufacturing:

(a) The installation of the mechanical equipment below the chassis on *new* semi-trailers or completely rebuilt semi-trailers (Italics ours).

(b) Transforming a Ford chassis into a tractor, including installation of a fifth wheel, strengthening frames by installation of fishplates, new and different brakes, additional lights, heaters and any other necessary equipment.

(c) Work on new pick-up trucks, including installation of side plates, lights, oil filters, heaters, brakes etc.

(d) Reconstruction or rebuilding of the twelve Gotfredson Diesel tractors, which included their complete dismantling, installation of new chassis or widening of the chassis and the complete rebuilding of these tractors, salvaging whatever parts that were capable of being used.

(e) Complete rebuilding or reconstruction of other Diesel tractors, which had been used by the defendant in the same manner as those mentioned in Subdivision (d), these tractors being completely worked out and useless except for the salvaging value.

(f) Installation of the refrigeration units, generators, etc. on refrigerated semi-trailers.

Reviewing all the testimony it is our opinion that here again the work done can be divided into what can be regarded as "safety of operation" and what not. To begin with the evidence shows that whenever a Gotfredson tractor was rebuilt by these plaintiffs defendant got a manufacturer's license plate for the new job to take it to its points of destination. Under

Section 4639, C.L.Michigan 1929, this has been interpreted to mean that the motor vehicles bearing those plates were "just manufactured". See People v. Wirth, 218 Mich. 493, 188 N.W. 390. Defendant also used these "manufacturer's plates" in connection with pick-up trucks and Ford tractors. It will be therefore apparent that defendant itself looked upon these as manufactured goods and under United States v. Armature Exchange, Inc., supra, a case interpreting a federal statute, defendant was certainly "manufacturing". Defendant should not be permitted to blow hot and cold, taking advantage of one law to be in the manufacturing business and another one not to be. Here the question of manufacturing or "building" is more determinative than in Case No. 2830.

We do not hold that defendant was "manufacturing" solely because it took advantage of whatever the "manufacturing plates" might give it, but it is clearly apparent that in its Detroit terminal defendant was so equipped that it could handle not only the biggest repair job that its ordinary business might entail but it could make trucks, trailers, and semi-trailers from equipment that had primarily never been intended for its kind of work or had been so used up in trucking that two old trucks together might be needed to finally get one suitable for defendant's use. The Gotfredsons were old trucks bought from a subsidiary and there was even some evidence that defendant sold one of its "manufactured" trucks.

It is not our thought, however, that all plaintiffs in Case No. 2834 are entitled to recover nor do we subscribe to the thought that whenever you install new equipment you are in the manufacturing business. Our holding is simply this—that where plaintiffs transform a Ford chassis into a tractor so that it can be used in defendant's business as in (b) and (c) and that part of (a) italicized above; where they reconstructed or rebuilt the 12 Gotfredson tractors salvaging whatever parts were capable of being used as in (d) above; and where they installed refrigeration units, generators, etc., on refrigerated semi-trailers as in (f) above, that was work not in "safety of operation". In those instances part of plaintiffs' activities were manufacturing, part for size, care and safety of cargo and part to make a new job comply with the law. We make the distinction between replacing old or broken brakes or lights with new. That's repair or maintenance work. We make the distinction between repair work that was completely repair work no matter how extensive the job had to be as in (e) above, differentiating between that and work that made it possible for defendant to begin its business with that particular piece of equipment.

Therefore, we hold that for those weeks where plaintiffs devoted a substantial part of their time to the type of work enumerated in (b) (c) (d) (f) and part of (a) italicized these plaintiffs are entitled to recover time and one-half for overtime as provided in the Fair Labor Standards Act. And in arriving at what is meant by "substantial" we must accept the Interpretative Bulletin No. 9 U. S. Department of Labor, Wages and Hours Division and the legal field letter dated May 23rd, 1941, sent out from the Office of the Solicitor of the Department of Labor in which it states that

"Any amount of work in excess of 20 percent of the total number of hours worked by the particular employee within a particular work week" brought the employee out of the Commission's jurisdiction.

United States v. American Trucking Associations, Inc., supra, is authority for the legal position that such "interpretations" though not conclusive are entitled to great weight. Personally we do not believe that twenty percent is a "substantial" part of one hundred percent but the finding of the labor department is fortified by decisions of our courts. In Klotz v. Ippolito, D.C., 40 F.Supp. 422, 426, plaintiff was employed primarily to have charge of defendant's bottling plant, a wholly local business except that he also at times unloaded beer and loaded empty beer containers into box cars which were part of an interstate transaction. Plaintiff did his "interstate" work only part of the time during approximately one quarter of the weeks he worked and the court held that during the weeks plaintiff had unloaded the beer and loaded empty beer containers into box cars he was entitled to recover overtime under the act. This case almost seems to hold that if the employee works at all in an interstate commerce capacity he can recover for the entire week. Incidentally, under the official regulations of the Wage-

Hour Administration Part 541, Par. 31301.-05 Vol. 2, Labor Law Service, 20 percent seems to be the amount hit upon in distinguishing who are and who are not salesmen. Klotz v. Ippolito, supra; Travis v. Ray, D.C., 41 F.Supp. 6; Fleming v. Knox, D.C., 42 F.Supp. 948; Missel v. Overnight Motor Transportation Company, 4 Cir., 126 F.2d 98.

■ The unit of measurement in all cases unless otherwise provided by contract is based on "weeks" (cases cited above).

■ We now come to the fourth part of this decision. The facts show that beginning with May 3rd, 1941, plaintiffs in suit 2830 had their pay reduced by defendant and have been paid time and one-half for overtime ever since. This court's opinion on this attitude towards the spirit of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., is expressed in Williams v. General Mills, D.C., 39 F.Supp. 849, and need not be rewritten here. The instant case is even more flagrant than that of General Mills because in that case there was admittedly a contract—"if legal". Here defendant company arbitrarily reduced plaintiffs' wages and then paid time and one-half for overtime on the reduced pay. This fact may become a valuable distinction to plaintiffs if our Supreme Court sees fit to reverse our decision in the General Mills case or the many other holdings to the same effect. Wilkinson v. Noland Co., D.C., 40 F.Supp. 1009, 1012. It is also well to note that defendant's men were not then organized which probably accounts for the success of defendant in forcing through the new rate. However, neither the courts nor the Act of Congress are available for only organized workmen. They are available and their benefits may be obtained by those who are not organized. Bumpus v. Continental Bakery Co., 6 Cir., 124 F.2d 549, 140 A.L.R. 1258; Fleming v. Carleton Screw Products Co., D.C., 37 F.Supp. 754.

It is therefore the opinion of this court that time and one-half for overtime shall apply from the week first beginning after March 4th, 1941, at the rate of pay plaintiffs were receiving at that time—not at the figure to which it was reduced in May, 1941.

■ The final and fifth question for this court to decide relates to overtime and double damages for the period prior to March 4th, 1941. Admittedly defendant will, in accordance with this opinion be obligated to pay double damages as well as overtime to those who are hereby judged entitled to recover, from the first week beginning after March 4th, 1941. But should defendant pay a penalty either in overtime or double damages previous to that date? We think not.

We are aware of the several decisions and great weight of authority to the effect that neither ignorance of the employer nor his good intentions are a defense against this penalty and that the above act providing for double damages is mandatory. St. John v. Brown, D.C., 38 F.Supp. 385; Missel v. Overnight Motor Transportation Co., 4 Cir., 126 F.2d 98; Reeves v. Howard County Refining Co., D.C., 33 F.Supp. 90; Cullum v. Stevens, D.C., 46 F.Supp. 73; Thompson v. Daugherty, D.C., 40 F.Supp. 279.

■ But here we have a different situation. We have the Interstate Commerce Commission which is a federal body. We have the Fair Labor Standards Act administered by another governmental department. The Fair Labor Standards Act does not apply to those persons over whom the Interstate Commerce Commission has the "power" to fix qualifications and hours. What that power was and over whom it could be exercised had to be settled by the Supreme Court of the United States and then by a five to four decision. The Interstate Commerce Commission itself is not yet united as to the real meaning of the word "substantial" that it used in rendering its own decision. One member still believes that the employee should devote more than 50 per cent of his time to safety of operation before coming under jurisdiction of the Commission. The District of Columbia Court didn't agree with the Supreme Court and four of the nine members of the Supreme Court didn't agree with the other five. In the light of this history it would be manifestly unfair to expect a business man to come to a conclusion on what these two laws meant when read together, under pain of heavy penalty if he didn't guess right. We agree with defendant that such interpretation might easily—if pressed—lead to a declaration ultimately by our Supreme Court that the Fair Labor Standards Act—if necessarily so construed—must therefore be in violation of the fifth amendment to the constitution, the due process clause. Cot-

ting v. Kansas City Stockyards Co., 183 U.S. 79, 22 S.Ct. 30, 46 L.Ed. 92; Ex parte Young, 209 U.S. 123, 173, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann. Cas. 764.

Furthermore, under our decisions the law must be clear in order to exact the penalty in a civil case. Here the act is both penal and remedial but the effect is not clear. We agree with plaintiffs' interpretation of the word "power" but where a group of men have made the laborious efforts that defendant and its competitors have to find out where they stand on these two laws it must be readily agreed that they should not be made to pay a penalty before that law was properly interpreted. Champlin Refining Company v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Van Camp & Sons Company v. American Can Company, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060; Small Co. v. American Sugar Refining Company, 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589.

We also direct attention to the exact wording of the double damage provision of the Fair Labor Standards Act. It uses the word "violation" and where was there more than a technical violation until the entire status of the parties had been clarified in March, 1941? How can we legally or equitably enforce a penalty for failure to conform with a statutory mandate when the nature of one's duty is not disclosed by the act itself?

We do not believe that these plaintiffs are entitled to one cent as penalty before March 4th, 1941. They are entitled to double damages after that time. They are also entitled to reasonable attorney fees and upon showing to this court preliminary to the signing of the decree the amount of those attorney fees will be then determined to be included in the decree.

In the case of Archie Patterson we seem to have nothing in the briefs and we could find nothing in the evidence as to just what his duties were. If by a reading of this opinion the parties cannot get together on Archie Patterson, the court will hear further argument or take testimony.

If the parties are unable to arrive at a definite conclusion on the amount due the several parties in the second suit, this court will be ready to discuss this matter with counsel before decree is entered.