### HUTCHINSON v. WILLIAM C. BARRY, Inc.

### No. 1833.

District Court, D. Massachusetts.

May 4, 1943.

Hammer, Karff & Goldberg, A. S. Karff, and Scotta V. Weymouth, all of Boston, Mass., for plaintiff.

Brown, Field & McCarthy and Horace P. Moulton, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

1. This is an action brought under the Fair Labor Standards Act, 29 U.S.C.A. §

201 et seq., by an employee against an employer.

2. The defendant, William C. Barry Inc., is a Massachusetts corporation engaged as a motor carrier, both common and contract, in both interstate and intrastate commerce. It is subject to the provisions of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq., and is admitted to be engaged in commerce as defined in § 3(b) of the Fair Labor Standards Act.

3. The defendant gave to Andrew J. Murphy authority to employ persons as washers, greasers, loaders and the like. Sometime prior to October 5, 1939, Murphy on behalf of the defendant employed John W. Hutchinson, the plaintiff. At the time of the hiring, Murphy explained the job as washing trucks and doing odds and ends in the defendant's garage in Medford. He said the schedule of hours would be from 7 P. M. to 7 A. M. with one hour off for a meal on each of the six work days of the week, except that there would be holidays on the night before New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Columbus Day, Thanksgiving and Christmas. That is, the normal work week was 66 hours. He said that the pay would be $30 a week. He did not specify an hourly rate; and, never having heard of the Fair Labor Standards Act or considered its application to the work in question, he did not seek to incorporate expressly or impliedly its terms within the offer of employment. The plaintiff accepted employment upon the terms offered and went to work on October 5, 1939. The parties have stipulated that this work made the plaintiff "engaged in commerce or in the production of goods for commerce" within the meaning of that phrase in § 7 of the Fair Labor Standards Act, but the defendant claims that the provisions of that section do not apply as a result of § 13 (b) of the same Act.

4. The plaintiff kept a record of his total time worked by making a record upon the defendant's time cards but in no other way. The defendant used these cards to calculate wages, social security taxes and the like and then destroyed the cards. However, the defendant preserved the wage data and those reflect accurately for present purposes (though not in the manner required by the regulations of the Wage and Hour Administrator and perhaps not in a manner which would exculpate the defendant in an equity or criminal proceeding brought by appropriate representatives of the government) the total hours worked by the plaintiff each week.

5. Neither the plaintiff nor the defendant kept any record of how the plaintiff divided his working time among several tasks. The testimony with respect to the division consists entirely of the generalized recollection of the plaintiff and those of the defendant's employees who were around the garage.

6. In performance of the agreement the plaintiff worked a full 66 hours each week beginning October 5, 1939, and ending July 25, 1940, except that he worked a shorter time, as indicated in the following table, during thirteen weeks:

| (1) | the week beginning | | | November 9, | 55 hours |
|---|---|---|---|---|---|
| (2) | " | " | " | November 23, | 55 " |
| (3) | " | " | " | December 21, | 44 " |
| (4) | " | " | " | December 28, | 44 " |
| (5) | " | " | " | February 1, | 55 " |
| (6) | " | " | " | February 15, | 55 " |
| (7) | " | " | " | March 7, | 55 " |
| (8) | " | " | " | April 4, | 44 " |
| (9) | " | " | " | April 11, | 55 " |
| (10) | " | " | " | May 23, | 55 " |
| (11) | " | " | " | June 27, | 55 " |
| (12) | " | " | " | July 18, | 55 " |
| (13) | " | " | " | July 25, | 55 " |

The plaintiff also worked at other times not now material.

7. The plaintiff received a compensation of $30 for each of these weeks except that he received $25 for the weeks beginning February 15, April 4, and June 13.

8. During each of these weeks the plaintiff spent at least one-half and sometimes nine-tenths of his working time in washing trucks, auto bodies and the like. During the period as a whole, that is, from October 5, 1939, through July 25, 1940, the plaintiff spent about two-thirds of his working time in washing.

9. When he was not washing automobiles, the plaintiff spent his working time in loading trucks, in driving to supply houses in the area of Greater Boston to secure necessary parts for repairing automobiles, in driving trucks from the defendant's Medford garage to its Somerville warehouse and return, and in driving automotive equipment to points in or outside of Massachusetts where defendant's trucks had had a breakdown. Upon the basis of the unsatisfactory oral testimony, I find that for the period as a whole, that is, from October 5, 1939 through July 25, 1940, the plaintiff spent about one-third of the time in these miscellaneous tasks, and more of

that time, particularly before March 17, 1940, (when the greaser who formerly drove to obtain auto parts lost his license), was devoted to loading than to any other activity. No evidence was offered to show, and it is impossible to ascertain, how much of the time in any particular hour or week was devoted to any one of or to all these miscellaneous tasks.

## Conclusions of Law.

1. The essential question in this case is whether the plaintiff, who admittedly would otherwise be within § 7 of the Fair Labor Standards Act, is removed from its operation by § 13(b). That subsection states in part that "The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act." 52 Stat. 1060, 1068, 29 U.S.C.A. § 213(b).

2. The findings show that the plaintiff spent two-thirds of his total time washing trucks and one-third loading and driving trucks of a common and contract carrier in interstate and intrastate commerce. If substantially all his time had been spent loading and driving trucks, the Interstate Commerce Commission, under § 204 of the Motor Carrier Act, 49 U.S.C.A. § 304, would have had power to establish maximum hours for him, the power would have been exercised, and he would have been within the exemption of § 13(b) of the Fair Labor Standards Act. I.C.C. Ex Parte No. MC-2; I.C.C. Ex Parte No. MC-3; United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Richardson v. James Gibbons Co., 4 Cir., 132 F.2d 627; Robbins v. Zabarsky, D.C.D.Mass., 44 F.Supp. 867. But where, as here, only one-third of his time is so spent at loading and driving and the rest at washing, the problem is more difficult.

3. Numerous issues are raised: (1) does § 204 of the Motor Carrier Act give the Interstate Commerce Commission the power to establish maximum hours for employees who spend only one-third of their total working time and in many weeks only one-tenth of their time at loading and driving; (2) if § 204 of the Motor Carrier Act gives the power, has the Commission exercised it; (3) if the Commission has the power but has not exercised it, does § 13 (b) of the Fair Labor Standards Act give an exemption [see United States v. American Trucking Associations, Richardson v. James Gibbons Co., Robbins v. Zabarsky, all supra]; (4) if the Commission has the power and either the Commission has exercised it, or there is no need that it should before § 13(b) applies, does § 13(b) give an exemption for a whole week if the employee was during a substantial part (or as in the case at bar, the greater part), of that week engaged in duties not connected with safety of operation but was "engaged in commerce or in the production of goods for commerce"; [See Wage and Hour Administration Bulletin No. 9, as amended, ¶ 5(c) and ¶ 5 note 6; Anuchick v. Transamerican Freight Lines, Inc., D.C.E.D. Mich., 46 F.Supp. 861, 865; McKeown v. Southern California Freight Forwarders et al., D.C.S.D.Cal. March 31, 1943, 49 F. Supp. 543; Lewis v. Nailling, D.C.W.D. Tenn., 36 F.Supp. 187. Compare the last paragraph of Walling v. Jacksonville Paper Co., January 18, 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. ——. Compare the somewhat analogous problems raised by Wage and Hour Administration, Regulations §§ 541.1F; 541.3(4); 541.4(B); 541.5(B); Report and Recommendations of Presiding Officer in the Matter of Proposed Amendments to Part 541 of Regulations, Oct. 10, 1940, §§ VI and VIII, C.C. H. Labor Law Service ¶¶ 31,302.22; 31,-302.23; 31,302.24; 31,302.63]; and (5) if § 13(b) does give an exemption to an employee who divides his work between commerce involving safety of operation and commerce not involving safety of operation, is the exemption for the work week or for some shorter or longer time (such as the hour or the month) during which the employee is engaged in activities affecting the safety of operations?

4. It is unnecessary for present proposes to resolve all these issues. Let it be assumed arguendo that the Interstate Commerce Commission has power to regulate the hours of an employee who is one-third of the time a driver and loader and two-thirds of the time a washer; and that the Commission has actually exercised the power. Let it also be assumed that in accordance with the letter of § 13(b) of the Fair Labor Standards Act (and in defiance of what seems its intent) when an employee is subject to the Motor Carrier Act on account of one-third of his activities he is not on the basis of the other two-thirds

subject to the hours provisions of the Fair Labor Standards Act. Even on those assumptions, I am of the opinion that the exemption is on a week-to-week basis, not on an hourly or monthly basis. When consideration is given to the structure of the Act, the demands of enforcement by the government and the necessities of practical operation of the businesses and occupations regulated, it is clear that no unit of time other than the work week is satisfactory in determining whether or not an exemption is applicable.

█ 5. Moreover, in accordance with the usual rule, the employer seeking to bring an otherwise regulated occupation within the scope of a particular exemption has the burden of showing that the facts make the exemption applicable.

█ 6. It follows from the two preceding paragraphs that in the case at bar the defendant, on the most favorable assumptions, can have the benefit of the exemption afforded by § 13(b) only for those particular weeks in which the defendant sustains the burden of showing that the employee spent a substantial part of his time at activities connected with safety of operations. But that is just what the defendant has not proved. It has no records showing the division of the plaintiff's work week by week, and the evidence offered is so generalized that no precise finding can be made. [Fdgs. 5 and 9, supra.] Therefore, I conclude that the defendant has not the benefit of the exemption afforded by § 13(b). I may add that in any event I should not construe the § 13(b) exemption as applicable in any week where the plaintiff spent more than fifty per cent of his time washing cars.

7. There are some other questions raised by the defendant but they may be disposed of summarily. Under the ruling in Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, the plaintiff's regular rate per hour, for the purposes of § 7 of the Fair Labor Standards Act, was 45½ cents. He was entitled to receive 68⅓₀ cents per hour for each hour longer than 44 hours a week he worked during the weeks beginning October 5, 1939, October 12 and October 19, and for each hour longer than 42 hours a week he worked during the weeks beginning October 26, 1939, and ending July 25, 1940. On this basis, he was underpaid $160.95, and is now entitled to recover that amount and also an additional amount of $160.95 as liquidated damages.

█ 8. The defendant suggests that if the regular hourly rate was 45½ cents, then there were weeks in which the plaintiff was overpaid and the defendant is now entitled to a credit for those weeks. For example, the defendant says that in the week beginning December 21, 1939, the plaintiff actually worked only 44 hours and so was entitled to only $20.48 but was paid $30 or $9.52 too much. To this asserted counterclaim the shortest answer is that there is no evidence that the money was paid under mistake of fact or of law. For aught that appears, the defendant was quite willing to overlook the absences of the two days in the week before Christmas. It is a familiar practice to allow weekly-paid employees to absent themselves occasionally without loss of pay for sickness, funerals or the like; and it may well be that this defendant would have permitted similar absences without loss of pay to hourly-paid employees. At any rate, there is nothing to indicate that there was any mutual mistake in the excess payment, or that the mistake, if one existed, was of fact rather than of law (if that be significant).

9. For reasons set forth in an opinion filed herewith the plaintiff is entitled in addition to the $321.90 referred to in conclusion 7 to an attorney's fee of $100 as well as costs.

### Opinion.

A problem that has troubled me in this case is fixing the amount that the defendant must pay the plaintiff as "a reasonable attorney's fee" in accordance with Section 16(b) of the Fair Labor Standards Act of 1938. 29 U.S.C.A. § 216.

The relevant facts are few. The plaintiff's counsel prepared this case for trial, appeared at a pre-trial session and at a motion session in this Court and tried the case for one day. The trial itself was shortened by the use of discovery procedures in accordance with the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The case involved few complications of fact or of law and gave no opportunity to show peculiar experience. The plaintiff has been completely successful and has the benefit of this Court's finding that he was underpaid $160.95 and that his recovery (aside from the attorney's fee) should be $321.90.

The issue which at once arises is whether the Court should order the defendant to pay the plaintiff as an attorney's fee the same amount that it would order the plaintiff to pay the attorney if the suit were by the attorney against the client on the basis of an implied contract. This issue has up to now perhaps escaped precise attention because undoubtedly many cases under Section 16(b) have been tried to a jury.

The issue was involved in Charles J. South v. George Lawley Corporation, Civil Action No. 1689, before Judge Ford in this Court and although he considered the matter and awarded a fee of $750, he did not write any opinion setting forth his reasons for his conclusions. Some of the reported cases decided by judges under Section 16(b) specifically indicate that the amount may be smaller than if the suit were by the attorney against the employee. Floyd v. Du Bois Soap Co., Com.Pl., 6 Ohio Supp. 76. And many judges seem to have placed the defendant's liability lower than they would have placed the plaintiff's if he had been sued by his lawyer in quantum meruit.

There may be various explanations for that result. The plaintiff by recovering double damages gets what is in practice, though not in theory (see footnote 24 in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 583, 62 S.Ct. 1216, 86 L.Ed. 1682), more likely to be a windfall than a compensation for damages suffered. The attorney's fee is a further addition to the amount payable to the plaintiff, not, as McLendon v. Bewley Mills,[1] apparently decides, to the attorney. And the plaintiff, by virtue of the double damage award, already has margin enough to pay his counsel's fee. Moreover, the rights of counsel are not foreclosed by a decision under Section 16(b) of the Act. Unlike workmen's compensation acts and similar legislation (Matter of Fisch, 188 App.Div. 525, 177 N.Y.S. 338) this Act does not limit the lawyer's fee. A lawyer can make private arrangements with his client for a fee larger than the Court orders the defendant to pay. And, theoretically, it is possible that if there were no express contract, the lawyer in a subsequent action based on quantum meruit, if he came before a different judge, or offered different evidence, might recover more from the employee than the employee had recovered from the employer.

In addition to these reasons other factors may have played a part in the law awards. Some judges do not sympathize with the purposes of the Act. Others dislike a provision which makes it possible for the plaintiff to get his own counsel fees paid if he wins, but does not require him, if he loses, to pay his opponent's counsel fees. A few may regard this statutory provision like the contingent fee which, as one commentator says, makes the lawyer "an interested party to the litigation because he is betting on its outcome", attracts "undesirable persons to become members of the profession" and brings the "bar into deserved disrepute." Reginald Heber Smith, "Justice and the Poor", pp. 85, 86. And others may fear that high awards will stimulate litigation vexatious to employers and inconvenient to courts.

None of those considerations seems to me conclusive, though they might well have been persuasive to a legislature.

I fully recognize that the provision in this Act for taxing counsel fees as costs is not mutual. It, therefore, is unlike the practice which now prevails in England (Arthur L. Goodhart, Costs, 38 Yale Law Journal 849) and in Alaska (Forno v. Coyle, 9 Cir., 75 F.2d 692) which did prevail in this country more than a century ago (Note on Distribution of Legal Expense, 49 Yale Law Journal 699, 701; see Sprague v. Ticonic Bank, 307 U.S. 161, 165, 59 S.Ct. 777, 83 L.Ed. 1184) and which has been revived in certain provisions of the Securities Act of 1933, 15 U.S.C.A. § 77k (e), the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i(e), and the Copyright Act, 17 U.S.C.A. § 40 and some proposals for state legislation [First Report of the Judicial Council of Massachusetts (1925) pp. 63, 64].

But the practice of taxing counsel fees only against a losing defendant and not against a losing plaintiff, however removed it is from English practice, is not novel in American regulatory legislation. The first modern federal regulatory statute of importance has just such a provision. Section 16 of the Interstate Commerce Act of February 4, 1887, 24 Stat. 384, 49 U.S.C.A. § 16. And, without attempting an exhaustive catalog, I note that similar discrimination favoring a victorious plaintiff but not a victorious defendant is to be found in sections of the Anti Trust Acts, 15 U.S.C.

---

[1] No opinion for publication.

298

A. §§ 15 and 72; the Railway Labor Act, 45 U.S.C.A. § 153(p); the Packers and Stockyards Act, 7 U.S.C.A. § 210(f); the Perishable Commodities Act, 7 U.S.C.A. § 499g (b); the Merchant Marine Act of 1936, 46 U.S.C.A. § 1227; the Communications Act of 1934, 47 U.S.C.A. § 206 and state legislation providing for the recovery of reasonable attorney's fees by the plaintiff in certain contract actions against railroads, insurance companies and building contractors. · (Globe Indemnity Co. v. Sulpho-Saline Bath Co., 8 Cir., 299 F. 219; Quanah, A. & P. Ry. Co. v. Price, Tex.Civ. App., 192 S.W. 805; Note 49 Yale Law Journal 699, 706, note 70).

The rationale in all the federal statutes is the same. The argument runs as follows. The government has set up a regulatory system for the benefit of persons in the plaintiff's class. To make the regulation effective private suits as well as public prosecutions are permitted. Suits by plaintiffs, if well founded, are in the public interest. Therefore, the cost of prosecuting successful suits should be borne not by those who were victims but by those who have violated the regulations and caused the damage. The fear of this liability for double damages and attorney's fees not only aids compliance, but promotes the settlement of controversies at the conference table or in the administrative office rather than the courts. No similar points, it is thought, can be made for imposing on an unsuccessful plaintiff the costs of the defendant's lawyer. The defendant's vindication in a larger sense serves the interests of justice, but no more so than the successful defense of any suit. Therefore, the public is not more interested in aiding him than any other successful defendant. Moreover, to allow him to recover his out-of-pocket expenses would deter suits by the plaintiffs who under the Fair Labor Standards Act, the Interstate Commerce Act, the Anti Trust Acts, the Packers and Stockyards Act and so forth are assumed, often correctly, to be necessitous persons requiring the protective hand of the legislature. Such deterrence runs counter to the policy of the Act in placing reliance for enforcement both upon private suits and public suits.

■ For these reasons the law gives the plaintiff both double damages and an attorney's fee. I have no discretion to re-fuse double damages [Missel's case] or to refuse an attorney's fee or to reduce an attorney's fee on account ·of the plaintiff's windfall of double damages. The spirit of the law is that the plaintiff gets as part of his recovery, if he wins, his whole reasonable counsel fees, not some fraction of them. This is so that he will not ordinarily be required to pay anything more to his lawyer. Of course, this does not mean that if an employee makes an excessive contract with his counsel, a court is bound to set the fee accordingly. See Goodhart, Costs, supra, p. 858.

I am not unmindful of the holding in Straus v. Victor Talking Machine Co., 2 Cir., 297 F. 791, 806 that under Section 7 of the Anti-Trust Act, 15 U.S.C.A. § 15 note, the plaintiff is not entitled to recover quite so large an attorney's fee as would be allowed in a suit by an attorney against his client. But any limitation implied in Judge Mayer's opinion in that case seems to be honored in the breach in his own court. In the very case in which he wrote, a $30,000 fee was set. And Rankin Co. v. Associated Bill Posters of U. S., 2 Cir., 42 F.2d 152, 156, upheld $50,000 in fees in a case where the plaintiff's recoveries against the defendant were $302,966.67.

Nor have I overlooked the fact that probate courts in awarding costs to litigants and insolvency or bankruptcy courts in fixing fees are not so generous as they would be in suits by attorneys against clients. It as been said that in such cases the general rule is that compensation paid to public officers for services of a similar character constitutes the standard. Boynton v. Tarbell, 272 Mass. 142, 172 N.E. 340. But in those cases, unlike the present case, there is no legislative purpose to foster and aid justifiable litigation without expense to the plaintiff.

■ I therefore determine the fee exactly as I would were the plaintiff sued by his counsel for a fee. Relevant and familiar criteria are set forth in the Twelfth Canon of the American Bar Association.

■ On the basis of time spent in the preparation and trial of this case, of ·the plaintiff's success, I set the attorney's fee at $100. I do not pass on the question of whether under the statute the fee will be subject to increase if the case is appealed and the plaintiff prevails on appeal.